Charlotte M. HOROWITZ, Plaintiff,

v.

The CURATORS OF the UNIVERSITY OF MISSOURI, University of Missouri, Columbia, Missouri, William H. Billings, Irvin Fane, Pleasant R. Smith, William C. Myers, Jr., Mrs. William C. Tucker, John Sam Williamson, Robert G. Brady, Theodore D. McNeal, G. Fred Kling, Jr. [members of the Board of Curators of the University of Missouri, individually and in their official capacities], Richardson K. Noback, M. D., Dean of School of Medicine, University of Missouri-Kansas City, Kansas City, Missouri, E. Grey Dimond, M. D., Provost-Health Sciences, University of Missouri-Kansas City, Kansas City, Missouri, and all other persons succeeding to or acting in the offices or official capacities of the above-named, and their agents, subordinates, and employees, Defendants.

Civ. A. No. 74CV47–W–3.

United States District Court,
W. D. Missouri, W. D.

Nov. 12, 1975.

---

* Any impact on such relief of the plaintiff's accepting a full-time position with a labor union must also be considered.

Arthur A. Benson, II, Kansas City, Mo., for plaintiff.

Jackson A. Wright, Marvin E. Wright, James S. Newberry and Richard S. Paden, Columbia, Mo., Fred Wilkins, Shughart, Thomson & Kilroy, Kansas City, Mo., for defendant Board of Curators.

## MEMORANDUM AND ORDER

JUERGENS,* Senior District Judge.

This civil rights action was tried to the Court without a jury on July 16 and 17, 1975.

The complaint alleges that:

"Jurisdiction exists under the provisions of the Civil Rights Act, 42 U.S.C. § 1983 and 28 U.S.C. § 2201, and seeks declaratory judgment, damages, injunctive and other relief to redress the deprivation by defendants, their agents, employees and others acting in concert with them, which acts were under color of state law, statute, ordinance, regulation, custom or usage of the plaintiff's rights, privileges and immunities secured by the Constitution of the United States. Jurisdiction rests upon 28 U.S.C. §§ 1343(3), 1343(4) and 1331(a). Plaintiff has been and, unless relief is granted in this case, will continue to be deprived by the defendants of due process of law.

"Plaintiff, Charlotte M. Horowitz, is a citizen of the State of New York and defendants are citizens of the State of Missouri. The amount in controversy exceeds, exclusive of interest and costs, the sum of $10,000.00.

"Plaintiff is a citizen of the United States and of the State of New York and was admitted to the School of Medicine, University of Missouri-Kansas City (U.M.K.C.) with advanced standing on August 30, 1971.

"Defendant, the Curators of the University of Missouri, is a duly incorporated and created body politic pursuant to Mo. Rev.Stat. 172.020, and is authorized by the Missouri legislature and has powers to determine admissibility of students, ap-

point and assign all duties and responsibilities to faculty and employees of the University, and confer all degrees.

"Defendant Noback is Dean of the University.

"Defendant Dimond is Provost-Health Sciences, U.M.K.C. The complaint also alleges that:

"The plaintiff has consistently performed outstandingly during her academic career. Upon application to the school, plaintiff had graduated from Barnard College, had earned an A.M. degree from Columbia University in New York, had studied at Duke University in pharmacology, and had been at the National Institute of Health for approximately five years doing work in psycho-pharmacology, where her scholastic achievements were superior. Enclosed with the application to U.M.K.C. for admission was a personal statement and autobiography, indicating that her ultimate career goal was a position in academic psycho-pharmacology. Plaintiff's scores on Graduate Record Exams were in the top one percent of all scores; her Medical College Admissions Test scores were above the ninetieth percentile in aptitude, and in the ninety-ninth percentile in achievement.

"It was with full knowledge of plaintiff's intent to pursue an academic medical career that she was accepted with advanced standing by defendants into the U.M.K.C. School of Medicine at the time the six-year academic program was first being implemented.

"On July 5, 1972, defendant Noback, M.D., Dean, sent a letter to plaintiff, relating a discussion between them on the previous Saturday. In the letter it was stated that the Council on Evaluation had completed a review of Advanced Standing students, including plaintiff. The letter further stated:

" 'Your acquisition of information is good, but your relationship with others had (sic) not been good and represents

---

* United States Senior District Judge William G. Juergens of the Eastern District of Illinois is sitting by assignment.

a major deficiency. You need to improve your relationship with others rapidly and substantially. This involves: keeping to established schedules; meeting all clinical responsibilities on time and gracefully; attending carefully to personal appearance including hand washing and grooming; participating appropriately in the activities of the School; and directing criticisms and suggestions to your Docent and to the faculty member who is in charge of a curriculum block . . .'

"The letter further informed plaintiff she was on probation.

"On January 29, 1973, plantiff received a letter from Dr. Morris A. Lipton, Professor of Psychiatry and Chairman of the Department of Psychiatry, and Dr. Arthur J. Prange, Jr., Professor of Psychiatry and Director of Research Development, at the University of North Carolina at Chapel Hill, offering plaintiff a position as Research Associate in the Department of Psychiatry. The position was initially to begin July 1, 1973, and later extended to September 1, 1973. Her salary was to be $10,500.00 plus fringe benefits. The work would consist mainly of assisting doctors in analyzing data and preparing manuscripts. The offer was contingent upon plaintiff's obtaining the degree of Doctor of Medicine.

"In a letter of February 7, 1973, after a meeting with plaintiff, Dr. Smull, Dr. W. Sirridge, and defendant Noback, Dr. Noback reiterated that plaintiff's progress had been reviewed by the Council on Evaluation, which made recommendations to the Coordinating Committee, which the latter accepted. Plaintiff was told in the letter:

" " . . . your progress has not been sufficient to show the improvements called for in my letter to you of July 5, 1972; for these reasons, you are being continued on probation; it is not possible for you to be a candidate for graduation in May of this year; and you must make a very marked and very substantial improvement in several areas. These are: clinical competence,

peer and patient relations, personal hygiene, and ability to accept criticism.'

"The plaintiff elected to exercise the option to request a special appeal of the Coordinating Committee's decision and received a letter on March 15, 1973, from Dr. Noback, stating that he had contacted several experienced physicians, whom plantiff as to her 'mastery of relevant a clinical setting, who would evaluate plaintiff as to her "mastery of relevant concepts, knowledge, skills, and competence to funcion as a physician.' After these sessions, each physician submitted a written statement of his recommendation and his reasons therefor. These recommendations went to the Council on Evaluation, which in turn made a recommendation to the Coordinating Committee.

"The results of the seven physicians asked to examine and evaluate plaintiff's skills and their recommendations are set out in the complaint.

"On the examinations of the National Board of Medical Examiners, plaintiff achieved the highest score among all members of her class on both Part 1 and Part 2. On the psychiatry section, plaintiff scored 795 out of the possible 800, one of the highest scores in the United States.

"In a letter, dated August 10, 1972, Dr. William T. Sirridge, Senior Docent and Professor of Medicine at U.M.K.C., stated that plaintiff "has the highest academic standing in the class."

"During plaintiff's two years at the medical school, she received only one 'no credit' in Emergency Room of all twenty-one clinical and academic courses recorded on her transcript. The grade of 'no credit' was recorded after plaintiff was denied the right to graduate in May of 1973.

"Between the time plaintiff was put on probation, July 5, 1972, for deficiency in interpersonal relations and the time the Council on Evaluation determined plaintiff should remain on probation (February 7, 1973), plaintiff took two courses; namely, psychiatry and medicine. The psychiatry evaluation stated that plaintiff felt accepted by people with whom

she worked, and the medicine evaluation rated her satisfactory in peer relationships and patient rapport.

"On July 6, 1973, plaintiff received la letter from Dr. Noback, stating that the Council on Evaluation had recommended that plaintiff not be allowed to continue in school after the end of May. This decision was subsequently accepted by the Coordinating Committee and Dr. Noback. The letter further concluded that the decision of the school was that plaintiff was no longer a student."

The complaint further alleges that:

"The defendants, Curators and others acting under color of law, have deprived plaintiff of rights, privileges and immunities secured under the Constitution and have exercised such powers so as to result in the violation of plaintiff's civil rights.

"Defendants have deprived plaintiff of the right to pursue the lawful calling to practice medicine, contingent upon her right to graduate from the University, by an act having no reasonable relation to any proper educational and governmental purpose, which is arbitrary, capricious, and a bad faith exercise of governmental power, thereby violating the due process and equal protection clauses of the Fourteenth Amendment.

"Defendants have deprived plaintiff of the right to pursue her lawful calling to practice medicine, contingent upon her right to graduate from the University, by actions such that plaintiff was not given a hearing in which she was allowed to present her position, explanation, evidence, and to produce witnesses in her behalf. Plaintiff's dismissal was not supported by substantial evidence.

"Having made on offer to plaintiff accepting her for admission to the School of Medicine, the plaintiff having accepted this offer by registering, a contractual relationship arose between the Curators and plaintiff. Plaintiff agreed to pay tuition and fees and the school agreed to provide instruction and subsequently a degree, if the student remained in good standing academically and abided by the school's rules and regulations. By dismissing plaintiff arbitrarily, the defendants breached their contract and are liable.

"The Curators of the University, by dismissing the plaintiff through the above procedures, have unreasonably imposed dismissal and refusal to graduate plaintiff for a cause inconsistent with its functions as a university and in a manner inconsistent with scholarly integrity and fair process."

Plaintiff prays for an injunction, enjoining defendants from dismissing plaintiff from the University of Missouri-Kansas City School of Medicine or alternatively that defendants be ordered to reinstate plaintiff as a student in good standing, to graduate plaintiff, and to enjoin defendants from engaging in policies and practices stated above; that plaintiff be awarded compensatory damage and exemplary and punitive damages in the amount of Ten Thousand Dollars due to the wanton, reckless, malicious and oppressive nature of defendants' actions.

The only issues of fact which are not admitted and remain to be litigated upon the trial are whether the graduating and evaluating system of the Medical School was applied fairly and reasonably to plaintiff; whether plaintiff satisfied all applicable requirements of the Medical School to graduate from the Medical School in June of 1973; whether the plaintiff's past performances in Medical School warranted her being continued in the Medical School beyond June, 1973; whether the progress and status of the plaintiff at the Medical School was evaluated in a manner similar to and consistent with the evaluation of other similarly situated students; whether plaintiff, because of her religion, was evaluated in a manner different than the evaluation of other students; whether plaintiff, because of her physical appearance, was evaluated in a manner different than the evaluation of other students; whether plaintiff paid her tuition and all associated expenses of her medical expenses in a timely manner upon receipt of statements therefor;

whether the education of medical specialists is not among the primary goals of the Medical School; whether plaintiff has suffered damages and, if so, in what amount; whether the actions of defendants in evaluating plaintiff's academic performance, denying graduating and dismissing plaintiff from medical school, were done in good faith.

In addition to the above questions of fact for consideration, plaintiff's counsel submits that the following are also issues of fact in the case: Whether prior to plaintiff's enrollment and during her attendance at the Medical School, plaintiff understood that a requirement to graduate with a degree medical doctor was that she acquire at least a degree of medical skills required by the average medical school in the country; whether prior to May 18, 1973, plaintiff was advised by defendants or their agents that her performance in pediatrics was so deficient that it would be relied upon in part to deny her promotion or graduation or in any way impede her progress through medical school; whether plaintiff has a reading knowledge of French, Russian and German and has experience in medical writing and computer programming.

During the course of the trial, the evidence totally failed to show that any member of the faculty at the U.M.K.C. School of Medicine or any of her docents to which she was assigned during her attendance at the University, or her chief docent, were prejudiced in any way against plaintiff because of her sex, race, religion or appearance. To the contrary, her chief docent, namely, Dr. William Sirridge, testified that if there was any prejudice on his part, it was in favor of the plaintiff rather than unfavorable; that he had spent more time with plaintiff, while acting as her docent, than he had with any of the other students for which he was docent; that he did everything he possibly could to assist her in obtaining the necessary medical skills to graduate with a M.D. degree; that he spent many hours with her, discussing the problems she was having in school generally. This testimony was further bolstered by Marjorie Sirridge, who was also a docent and professor at the

University and who was the wife of Dr. William T. Sirridge.

Dr. William Sirridge testified that plaintiff was always the last to enter a room for classes, was always the last in line in making rounds; that after plaintiff received the letter from Dean Noback on July 5, 1972, he discussed in detail with the plaintiff the need for her keeping to established schedules, meeting all the clinical responsibilities on time and gracefully, and emphasized she must pay more attention to her physical appearance, including her cleanliness and grooming, and that it was necessary for her to participate in all the activities at the school with regard to her classes; that she must learn to accept criticism for what it was, in that it was meant to be of assistance to her and was not meant in a derogatory fashion. Her docent, Dr. William Sirridge, counseled with her on many occasions in an attempt to encourage her to meet all of the required medical skills so that she might graduate on schedule. He further testified that plaintiff would never admit an error; that "it was always other persons fault, not hers"; he encouraged her constantly to keep herself neat and clean and cautioned her on several occasions about the condition of her white coat and its cleanliness, especially when seeing patients, but that plaintiff was unkempt in her personal appearance, about which he cautioned her many times, perhaps a hundred times. Plaintiff was constantly criticizing the school curriculum. He sought to emphasize to her that in order to receive a M.D. degree, it was necessary for her to obtain the necessary medical skills. He attended a meeting of the Council concerning plaintiff at the first evaluation with the effect that she was retained in school. At the second evaluation, he appeared before the Committee and asked that plaintiff be kept in school. He conferred with the Committee for at least three hours, which resulted in plaintiff's being retained in school. He explained to plaintiff that pediatrics is a necessary part of the program to graduate from the school; that she would have to give more attention to the pediatrics pro-

gram if she hoped to graduate. He emphasized that plaintiff's problem was that she thought she could learn to be a medical doctor by reading books, and he advised her the clinical skills were equally as important for obtaining the M.D. degree. He further testified that plaintiff cannot perform many of the necessary basic skills required of a practicing physician; that notwithstanding his calling plaintiff's deficiencies to her attention, she did not correct them and he had no knowledge of anyone in the school who was prejudiced against plaintiff because of her sex or her religion; that once a student graduates from the school, that person is then free to practice medicine generally.

Dr. Richardson K. Noback, Dean, U.M.K.C. School of Medicine, also a Professor of Medicine, testified that he counseled with plaintiff on several occasions prior to meeting with the Council and discussing plaintiff's academic status; that on February 7, 1973, after meeting with plaintiff, Dr. Smull, and Dr. W. Sirridge, he wrote a letter to the plaintiff, informing her that she had failed to make sufficient improvement called for in his prior letter of July 5, 1972, when she was placed on probation; that it would not be possible for her to graduate in May, setting forth the reasons for the continued probation and the areas in which she needed to make marked improvements.

The evidence also established that following receipt of the February 7 letter from the Dean, plaintiff elected to exercise the option to request a special appeal of the Coordinating Committee decision. After receiving this request, the Dean then contacted seven experienced physicians, informing them that she would contact them for evaluation and that he wished the doctors to examine her in clinical setting to evaluate her as to her "mastery of relevant concepts, knowledge, skills and competence to function as a physician." Dr. Noback then advised plaintiff by letter as follows:

March 15, 1973

Miss Charlotte Horowitz
University of Missouri-Kansas City
School of Medicine
Kansas City, Missouri
Dear Miss Horowitz:

In response to your recent request and in keeping with the Academic Plan I have asked seven experienced physicians to serve as a panel to provide a careful, detailed, and thorough assessment of your abilities at this time. The School is asking each of these physicians to conduct such an impartial, careful, and searching assessment of your present competence. For the clinicians this will involve spending several hours with you as you examine one or more patients with each of these physicians and as you discuss the cause, manifestations, pathophysiology, course, and management of the problems of the patient or patients whom you will see. The pathologists may use clinical protocols, slides, and other laboratory items to lead into similar discussions.

The following list contains the names of these physicians, the general topic in the curriculum about which we are asking them to evaluate your performance, and their office telephone numbers.

| Dr. Richard D. Blim | Pediatrics | 561–8100 |
| Dr. Hilliard Cohen | Pathology/Anatomy | 861–4700 X327 |
| Dr. James E. Crockett | General Medicine | 931–1884 |
| Dr. Mark Dodge | General Medicine | 531–0552 |
| Dr. Raymond W. Latham | Pediatrics | 561–6060 |
| Dr. Robert L. Newman | Obstetrics and Gynecology | 932–2047 |
| Dr. Mark D. Ost | Pathology/Anatomy | 361–3500 X345 |

I am asking each physician to observe you as you go through those steps and procedures appropriate to a Year 6 student and evaluate the extent of your mastery of relevant concepts, knowledge, skills, and competence to function as a physician. I am asking them to use such steps as observing you as you evaluate a

patient by taking the history, carrying out the physical examination, collecting and evaluating other data, formulating a problem list, and developing a management plan. I am asking them to discuss with you the patient's situation and illness to determine the extent of your information as well as other aspects of clinical competence. This may involve discussing the cause, manifestations pathophysiology, course and management of the problems of one or more patients.

At this point I am asking you personally to make contact beginning on Monday, March 19 with each physician on the list to arrange a satisfactory time for this set of oral and practical examinations. The physician's office or his hospital may provide the setting and the patients to be examined. If the physician prefers, the setting may be at one of our affiliated hospitals. You should plan on several hours to a half-day for each of these sessions. Please keep your Docent informed.

At the end of your experience with each of these physicians the School is asking the physician for a careful written statement of his recommendations and the reasons for his recommendations. The recommendations of your examining panel will then go to the Council on Evaluation. That Council will make its recommendations to the Coordinating Committee.

In this way the School has established a careful, deliberate, and impartial process to provide recommendations about your status at this time. On a personal note, I would like to encourage you to look forward to these clinical sessions with experienced and able physicians.

> Richardson K. Noback, M.D.
> Dean

RKN:j

cc: Dr. William T. Sirridge.

Of the seven doctors contacted, the evidence established the following:

Dr. Newman recommended as follows: "My recommendation would be that the student not be permitted to graduate at the end of May 1973, that she remain on probation to the end of May 1973 and her performance can be reassessed at that time depending on the evaluation as to whether she should be totally dropped from the school."

Dr. Dodge recommended that he would favor giving plaintiff a M.D. degree, but that she would not qualify to intern at St. Luke's where he practiced.

Dr. Latham stated that plaintiff did not compare favorably in clinical performance with other senior students with which he had worked as an instructor in the pediatric clinics; that she would have to improve a great deal in examination methods and completeness in study of patient problems before she would be a useful member of a hospital staff. He further stated: "I am certain that she is not presently qualified to receive a medical degree but would hesitate to give an opinion about other alternatives."

Dr. Blim stated that Miss Horowitz had been given two patients from Emergency at Mercy Hospital; that she proceeded with history taking, examination and eventual discussion of the current disease process and discussion of treatment; that as a result of approximately 2½ hours having been spent with Miss Horowitz in a clinical setting, he found she demonstrated substantial deficiencies; that she appeared to have no concept of proper history taking, even lacking the ability to ascertain the chief complaint, and even more difficulty in obtaining any history of present illness, and has no concept or ability to perform a physical exam; that she has not adequately mastered the ability to develop a problem list or differential diagnosis and, of course, cannot develop any reasonable suggestions for further testing and/or therapy. It was Dr. Blim's firm recommendation that she be dropped from the medical school.

Dr. Hilliard Cohen, Pathologist from the Veterans Administration Hospital, concluded that plaintiff had prepared herself well and was performing very satisfactorily; that she should continue on the curriculum schedule, and recommended that she be graduated at the end of May, 1973.

Dr. Ost recommended that plaintiff should not be graduated from medical school in May and stated he further doubted whether any additional remedial work would be adequate to solve her basic problems which seemed to be ones of personality and inability to correlate information. It was his recommendation that the student be dropped from the medical school.

Dr. Crockett gave the opinion that the plaintiff did not at the time of the interview possess the necessary skills and knowledge to perform as a safe physician and recommended that she be required to continue in the School of Medicine on probationary status for one more year.

It must be noted that only two of the doctors recommended she be graduated, and one of those two doctors, although recommending granting the degree, stated she would not qualify to intern at the hospital where he worked. Five of the seven doctors recommended that she not graduate in 1973. Two of the five recommending that she not graduate recommended an additional period of probation. Two of the five recommending no graduation also recommended that she be dropped from school. One of the five recommending no graduation gave no opinion as to alternatives, other than she was not qualified for a degree. These reports were returned to the Dean and were considered, together with all the other findings of the staff and faculty of the Medical School, by the Council on Evaluation and the Coordinating Committee. In July of 1973 the Council on Evaluation recommended that plaintiff not graduate and that she not continue in the school after the end of May. This evaluation was presented to the Coordinating Committee, which agreed, and the recommendation was accepted by the Dean. Plaintiff was then notified she was no longer a student.

During the course of her attendance at the school, plaintiff wrote some rather scathing letters to her docent in which she criticized severely various members of the staff, both with regard to their conduct and with regard to their ability to perform their various functions. In one of the letters she stated: "The outpatient service was a waste of time and I didn't care for it." She further stated:

"This was not a learning experience, but an opportunity for the hospital to obtain free labor. I could have learned more medicine by doing half the number of examinations and by having the afternoons free for reading the textbook."

In this same manner she evaluates some of the doctors involved in the outpatient clinic—referring to one of the doctors, namely, Dr. Katherine Smith, as "a bitch and a bigot." In the entire letter she is critical of practically the entire curriculum, the method in which the school was being conducted, the competency of the doctors, several of whom she was of the opinion were totally incompetent. In referring to Dr. Wenner, one of the docents in pediatrics, she stated as follows:

"To say the least, I did not care for Dr. Wenner. He is a highly competitive individual who does not like bright students. In fairness to him, he did spend a large amount of time teaching microbiology to us. He knows a great deal about microbiology and likes to show off his knowledge. He is, however, a frustrated pseudointellectual who becomes upset when the Real McCoy shows up."

The evidence further disclosed that the plaintiff was made aware of the requirements that she qualify in clinical skills in order to obtain the M.D. degree.

Statistics showed that at U.M.K.C. Medical School the classes consisted of 20% women in 1971, 20% women in 1972–1973, and 30% women in 1973–1974.

One of the doctors whom plaintiff charges was biased against her because of her religion was Dr. Katherine W. Smith, who testified she had taught plaintiff in the clinic but she does not recall slamming the door in her face; that she had talked to plaintiff about her cleanliness and hygiene and on at least one occasion offered her coat to plaintiff because plaintiff's white coat she was wearing was so very dirty; that she advised plaintiff that she should wash her hands before examining a patient

and again after the patient was examined. Plaintiff testified she felt this was a bit much.

In the landmark case of *Dixon v. Alabama State Board of Education*, 294 F.2d 150 (5 Cir. 1961), students were expelled apparently for engaging in lunch-counter demonstrations. The court held that "the rudiments of an adversary proceeding may be preserved" but stated that on the other hand it was established that "due process" does not require notice and a hearing for a student expelled for scholastic failure; and further stated that the courts will not intrude into the domain of academic standards where school, not judicial, officials are those properly qualified to execute judgment. However, the courts are not totally precluded from examining scholastic dismissals. If the student was actually expelled for reasons other than the quality of his work or if the student failed because of bad faith or arbitrary or capricious action by an instructor, the courts will order the granting of a fair and impartial hearing. *Brookins v. Bonnell*, 362 F.Supp. 379 (D.C.E. D.Pa.1973).

Despite the immunity accorded in academic matters, the determination by educational authorities of a student's academic or emotional fitness may be actionable if the adverse determination complained of is motivated by bad faith; where a medical student has been dismissed for failure to attain the proper standard of scholarship, two questions may be involved: the first, was the student in fact delinquent in his studies or unfit for the practice of medicine; secondly, were the school officials motivated by malice or bad faith in dismissing the student, or did they act arbitrarily or capriciously. In general, the first question is not a matter for judicial review. However, a student dismissal motivated by bad faith, arbitrariness or capriciousness may be actionable. *Depperman v. University of Kentucky*, 371 F.Supp. 73 (D.C.E.D.Ky. 1974).

As was stated in *Keys v. Sawyer*, 353 F.Supp. 936 (D.C.S.D.Tex.1973), university officials should have broad discretionary power to determine the fitness of a student to continue his studies. There is a compelling need and very strong policy consideration in favor of giving local school officials the widest possible latitude in the management of school affairs, and only when there is a clear and convincing showing that an official acted in an arbitrary and capricious manner will the federal courts interfere with the exercise of such discretionary power.

In support of her position, plaintiff relies strongly on *Greenhill v. Bailey*, 519 F.2d 5, in which the Court of Appeals for the Eighth Circuit reversed the District Court. The Court of Appeals found that the officials of the University of Iowa College of Medicine had by its action been guilty of denigrating Greenhill's intellectual ability, as distinguished from his performance, and that the action deprived him of a significant interest in liberty, for it admittedly imposed on him a stigma or other disability that forecloses his freedom to take advantage of other opportunities. In reversing the District Court, the Court of Appeals found that the school, by its officials, sent to the Association of American Medical Colleges in Washington, D. C., a form upon which it was indicated that Greenhill had been dismissed "due to Poor Academic Standing" and that the apparent reason therefor was "lack of intellectual ability or insufficient preparation."

Greenhill is readily distinguishable from the present case as shown by the facts enumerated in this opinion.

In the decision of the Court of Appeals, the Court stated:

"We are well aware that there has long been a distinction between cases concerning disciplinary dismissals, on the one hand, and academic dismissals, on the other. See *Brookins v. Bonnell*, supra, 362 F.Supp. at 382, and the cases collected therein. Our holding today is not an effort to blur that distinction but rather an acknowledgment that the dictates of due process, long recognized as applicable to disciplinary expulsions (and suspen-

**1112**

sions of significant length), may apply in other cases as well, where the particular circumstances meet the criteria articulated by the Supreme Court in *Board of Regents v. Roth*, supra [408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548], and *Perry v. Sindermann*, supra [408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570]."

At the conclusion of the opinion, and specifically appearing in Footnote 12 thereof, appears the following:

"Since this case must be remanded for future administrative proceedings, we do not reach Greenhill's contention that he was denied substantive due process. However, we think this additional caveat is appropriate: For a court to overturn a student's dismissal on substantive grounds it must find that such dismissal was arbitrary and capricious. [citing cases]. That standard is a narrow one, to be applied only where administrative action 'is not supportable on any rational basis' or where it is 'willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case.' *First National Bank v. Smith*, 508 F.2d 1371, 1376 (8th Cir. 1974). Educational institutions can judge a student's performance better than can a court of law, particularly in an advanced field such as the study of medicine. [citing cases]. Only the most compelling evidence of arbitrary or capricious conduct would warrant our interference with the performance evaluation (grades) of a dismissed student made by his teachers."

■ The evidence presented in this case totally failed to establish that plaintiff was expelled for any reason other than the quality of her work. It also failed to show that dismissal was because of bad faith, arbitrary or capricious action by any instructor. The evidence presented is strongly to the contrary; it appearing that plaintiff's docent went to great lengths and extremes in his efforts to assist the plaintiff in every phase of her education, repeatedly calling to her attention deficiencies noted by the school authorities.

■ Considering all of the evidence presented, the Court finds that the grading and evaluating system of the medical school was applied fairly and reasonably to plaintiff, but plaintiff did not satisfy the requirements of the medical school to graduate from the medical school in June, 1973.

■ The Court further finds that plaintiff's performance in the medical school and after having been placed on probation for an extended period of time did not warrant her being continued in the medical school beyond June, 1973, inasmuch as she had been placed on probation and was repeatedly cautioned of her deficiencies and had been given a year within which to correct the noted deficiencies.

■ The Court further finds that the progress status of plaintiff in the medical school was evaluated in a manner similar to and consistent with the evaluation of other similarly situated students, with the exception that plaintiff's docent, namely, William Sirridge, went to even greater lengths to assist plaintiff in an effort for her to obtain her M.D. degree, than he did for any of his other students. In the opinion of the court, his assistance to the plaintiff went far beyond the call of duty. There was no evidence that plaintiff was in any manner evaluated differently from other students because of her sex or because of her religion. With regard to plaintiff's physical appearance, this in and of itself did not cause plaintiff to be evaluated any differently than any of the other students; however, plaintiff's unkempt appearance and condition were much cause for concern with both faculty and students, and this was brought to her attention on numerous occasions; but she was not treated in any other manner than any other student with similar deficiencies would have been treated.

There was no evidence concerning plaintiff's payment of tuition or assessed expenses; thus, the Court assumes they were paid in a timely manner.

■ The primary goal of U.M.K.C. Medical School is the graduation of students with an M.D. degree, capable of practicing

medicine as a physician. The Court does not find that plaintiff has suffered any damage by any improper acts on the part of any of the defendants. The Court finds that defendants acted properly in evaluating plaintiff's academic performance and in denying graduation and in dismissing plaintiff from medical school, since the evidence overwhelmingly showed plaintiff was not capable of performing as a medical doctor.

The Court further finds that during plaintiff's enrollment and during her attendance at medical school, she was advised, and fully understood, that a requirement to graduate with the degree Medical Doctor was that she acquire at least a degree of clinical skills required by the average medical schools in the United States.

As to whether plaintiff was advised prior to May 18, 1973, that her performance at pediatrics was so deficient that it would be relied on in part to deny her promotion or graduation, or in any way impede her progress through medical school, is of little importance, since the performance in other fields and her proficiency generally were not adequate to permit, much less require, graduation from the school with a degree of Doctor of Medicine. Whether plaintiff has a reading knowledge of French, Russian and German and is experienced in medical writing and computer programming has no bearing on whether or not she is or was a proper candidate for graduation with a degree of Doctor of Medicine.

The Court has considered the procedural due process accorded the plaintiff and in the light of all of the evidence presented and in keeping with the case law heretofore expounded, including the most recent case by the Court of Appeals for the Eighth Circuit, namely, *Greenhill v. Bailey*, 519 F.2d 5, finds that under the facts of this case plaintiff was afforded full procedural due process by the U.M.K.C. Medical School. In fact, the Court is of the opinion, and so finds, that the school went beyond the procedural due process by affording plaintiff the opportunity to be examined by seven independent physicians in order to be absolutely certain that their grading of the plaintiff in her medical skills was correct.

IT IS, THEREFORE, THE ORDER of this Court that judgment be and the same is hereby entered in favor of the defendants and against plaintiff, Charlotte M. Horowitz. Plaintiff to take nothing by her suit.

Costs to be assessed against the plaintiff. Execution to issue therefor.