**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0488n.06

**No. 12-5354**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| NINA YODER, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNIVERSITY OF LOUISVILLE; | ) | |
| ERMALYNN KIEHL, in her official | ) | |
| and individual capacity; MARCIA | ) | ON APPEAL FROM THE |
| HERN, in her official and individual | ) | UNITED STATES DISTRICT |
| capacity, | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF KENTUCKY |
| Defendants-Appellees. | ) | |
| | ) | |

Before: WHITE and DONALD, Circuit Judges; and VARLAN, Chief District Judge.[*]

**HELENE N. WHITE, Circuit Judge.** Plaintiff-Appellant Nina Yoder, a former student at the University of Louisville's School of Nursing ("the SON"), appeals the district court's grant of summary judgment in favor of Defendants-Appellees University of Louisville (the "University") and University employees Ermalynn Kiehl and Marcia Hern (collectively, "Defendants") in this 42 U.S.C. § 1983 action alleging that Defendants violated Yoder's First Amendment right to free speech and Fourteenth Amendment right to due process by dismissing her from the SON for a blog post on her MySpace.com page (the "Blog") that discussed various aspects of a birth she witnessed as part

---

[*]The Honorable Thomas A. Varlan, Chief United States District Judge for the Eastern District of Tennessee, sitting by designation.

of the SON's childbearing clinical program. Because we conclude that Defendants are entitled to qualified immunity and that the SON's policies are neither overbroad nor vague, we AFFIRM the district court's grant of summary judgment.

## I.

In January 2007, Yoder enrolled in an undergraduate nursing program at the SON. In September 2008, as part of her transition to the upper-division courses, Yoder signed an Honor Code pledge ("Honor Code") that stated:

> I join my fellow students today to pledge my commitment to the highest ideal and academic standards of my education at the University of Louisville School of Nursing.
>
> I recognize I am entering a profession in which I have responsibility for the lives of others. With that responsibility comes accountability for my actions.
>
> Therefore, as a representative of the School of Nursing, I pledge to adhere to the highest standards of honesty, integrity, accountability, confidentiality, and professionalism, in all my written work, spoken words, actions and interactions with patients, families, peers and faculty.
>
> I pledge to work together with my peers and to support one another in the pursuit of excellence in our nursing education and to report unethical behavior.
>
> I will work to safeguard the health and welfare of clients who have placed their trust in me and will advocate for the client's best interest.
>
> I recognize that these responsibilities do not end with graduation, but are a lifelong endeavor.

As part of her studies at the SON, Yoder took a childbearing clinical course, which required that she follow a pregnant patient through the birthing process. In January 2009, in conjunction with the course, Yoder signed a Confidentiality Agreement ("Confidentiality Agreement"):

> I _____ do hereby agree to consider confidential any and all information entrusted to me throughout my clinical rotations while a student at the University of Louisville School of Nursing. This includes medical, financial, personal, and employment related information. I realize that information shared with others could bring harm to clients. Further I understand that a proven violation of confidentiality may be cause for immediate termination of access to further data and is grounds for immediate dismissal from the School of Nursing.

When Yoder identified a pregnant patient (the "Patient") to follow, both Yoder and the Patient signed a Consent Form ("Consent Form"), which provided in pertinent part:

> Any information shared with the named nursing student will be used by that student only for written/oral assignments. My name and my family's name will not be used in any written or oral presentation by the named student. I understand that information regarding my pregnancy and my health care will be presented in written or oral form to the student's instructor only.

On February 2, 2009, Yoder posted a blog entry on her personal MySpace.com[1] webpage entitled, "How I witnessed the Miracle of Life." The Blog stated in full:

> As part of my mother-baby clinical (99% of the time clinicals are a waste of my time) I was assigned to find a pregnant mother and follow her around. I didn't look far. If you have ever worked a 12-hour shift in the hospital, you'd know that 50% of females there are at various stages of pregnancy. People say that there's something in the water. I say it's the shift - basically, she works 3 days and has 4 days to do everything else, including getting knocked up. That's how I got surprised with my own Creep - I was working nights in the ER. Never thought I'd have one, but there ya go. If your wife is infertile, send her to work at the hospital, she'll come back with triplets.
>
> Anyway, I found my mom fairly easy - I just came to work and confronted one of the ladies. Good thing that it was her third pregnancy - and she had no problem with me

---

[1]"MySpace is a popular social-networking website that allows its members to create online 'profiles,' which are individual web pages on which members post photographs, videos, and information about their lives and interests." *Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 208 (3d Cir. 2011) (citation and internal quotation marks omitted).

being stuck to her like a tick to an ass, so I cordially invited myself to observe the glorious moment of The Popping.

Now, let's bust some myths.

**1. "Pregnant women are beautiful"**

No.  Hell - no.
*Beautiful* pregnant women are beautiful, or more like, only slightly distorted with the belly (as was the case with my "mom").  Otherwise, pregnancy makes an ok-looking woman ugly, and an ugly woman - fucking horrifying.

**2. "You're all glowing"**

Oh really?  Is that all the sweat from having to lug 35 extra lbs?

**3. "Babies are God's little miracles"**

I gotta admit, there is something freakishly fascinating with the fact that one bunch of coiled protein grows a tail, forms an army, and attacks another bunch of coiled protein (which gets released by signals from a whole lot of proteins and waits patiently in a soft bed of all sorts of other proteins), then 23 + 23 becomes 46, immediately gets determined whether it's an XX or XY, or XXY or XYY, or some retarded XXXY . . . anyway, it's an amazing process.  But IMHO [in my humble opinion] these 'miracles' are demons sent to us from hell to torture us for the whole eternity.

**4. "Children are such joy!"**
Someone referred to having kids as like being pecked to death by chickens.  I'll say that it's more like being ripped apart by rabid monkeys.

*******************************

Last Friday I armed myself with a camera, and journeyed to the assigned hospital, where I met my wonderful lady, getting ready to pop.  Since it was her third kid, everyone expected her to shoot it out within 30 minutes.  She was already getting induced by elephantine dose of Oxytocin (Mmmm, Oxytocin!) I took my camera, put it on "Rec" and assumed the position.

45 minutes later, no baby.

4

1 hour 30 minutes later, no baby.

The anesthesiologist comes in and sets up my girl with an epidural.  Having it done is one thing; watching someone else getting it done is another.  The doc took out this teeny needle first and numbed her up.  Then she took out this huge-ass 10 inch needle and jammed it into her spine!

I was watching the whole thing, with my face changing expressions like Louis De Funès'.  But I guess everything went fine, because my 'mom' was back into position in no time, waiting for the Creep to show up.

3 hours later, no baby.

I'm looking at the mother with sheer disdain, she looks at me with sheer anger, but still - no baby.

I've got to go to work this evening, and I'm starting to cuss.  I haven't slept in 36 hours, so I went to my car, got my blanket, kicked the nervous spouse out of the recliner, and went to sleep.

4 hours later she starts to throw up.  I jump up, and turn my camera on again, assuming the position of a greyhound, right in between her legs.

. . . no baby.

5 hours.

6 hours.

7 hours.

My eyes are starting to feel like they're filled with sand, and my heart is starting to palpitate.  The momma is throwing up, the daddy's stomach is growling and he's starting to bitch like a 14-year-old school girl in the mall.

8 hours later, the nurse comes in, checks the momma, and says, "ok, we're ready to push".

FINALLY!!!  I turn my camera on again.  Two more nurses, and a woman doctor come in.  They put my momma into a position of American Eagle, prop her up with pillows, and shine bright light at the cooch.

The momma's family is sitting in the corner, shaking all over, with the two younger brothers of the baby, the in-laws, and the bitching spouse. At last my girl gave one big push, and immediately out came a wrinkly bluish creature, all Picasso-like and weird, ugly as hell, covered in god knows what, screeching and waving its tentacles in the air.

15 minutes later it turned into a cute pink itty bitty little baby girl. Mom was forgotten, the whole squacking family surrounded the new Creep; she was crowned with a pink cap, wrapped into a blanket and finally shut up with a teat.

I came to work, overwhelmed with emotions and new knowledge and experience. I sat down, looked around and once again proved that women are FREAKING STUPID and don't learn from their past mistakes.

I said: **"I want another baby!!"**

The End.

In late February 2009, Glenda Adams, the childbearing clinical course instructor learned about Yoder's Blog from another SON student, and informed Kiehl, the Associate Dean of the Undergraduate Programs at the University. Kiehl met with Hern, the Dean of the SON, to discuss the Blog, and they agreed that Yoder should be dismissed from the SON for violating "the [H]onor [C]ode and the standards of the profession and a [C]onfidentiality [A]greement."

Kiehl asked Adams to contact Yoder and request that they meet the following morning, February 27, 2009. When Yoder arrived at what she thought would be a meeting with Adams, she instead found Kiehl, a physician who provides psychological support to students, and two law enforcement officers. Kiehl showed Yoder copies of the Blog, stated that the Blog violated patient confidentiality and the Honor Code, and informed Yoder that she was being dismissed from the

6

SON. Several days later, Yoder received a formal letter of dismissal from Hern that stated, in relevant part:

> It has been determined that your internet postings regarding patient activities and identification as a University of Louisville School of Nursing student violates the nursing honor code which you pledged to uphold on September 7, 2008. Upon evaluation of your demonstrated fitness to continue in the program in accordance with promulgated professional standards established by the School of Nursing, you are receiving an academic dismissal from the School of Nursing and the three nursing classes in which you are currently enrolled this Spring 2009 semester.

Pursuant to the SON's policy, Yoder submitted a written petition with the Undergraduate Academic Affairs Committee requesting reinstatement in the SON program. Yoder was not permitted to participate in the Committee's deliberations, and on March 9, 2009, in a letter signed by Kiehl, the Committee denied Yoder's petition for reinstatement. Yoder did not pursue any additional internal grievance procedures.

## II.

On March 12, 2009, Yoder filed a complaint pursuant to 42 U.S.C. § 1983 claiming that her dismissal from the SON violated her right to free speech and due process under the First and Fourteenth Amendments of the United States Constitution. The complaint named the University, Hern, and Kiehl as defendants,[2] and asked that: (1) Yoder be reinstated as a nursing student, (2) she be granted full credit for all academic work missed, (3) her disciplinary and academic record be cleared, and (4) University employees be enjoined from disclosing information regarding the incident. Yoder also sought compensatory damages, punitive damages, and attorney fees.

---

[2]The complaint named Hern and Kiehl in both their official and individual capacities.

After discovery, the parties filed cross-motions for summary judgment. On August 3, 2009, the district court granted Yoder's motion for summary judgment. *See Yoder v. Univ. of Louisville*, No. 3:09–CV–205–S, 2009 WL 2406235 (W.D. Ky., Aug. 3, 2009) (unpublished). However, the court did not resolve Yoder's § 1983 claims on free speech and due process grounds, instead deciding the case on a contract theory. *Id.* at *6. The court entered a permanent injunction compelling the University to reinstate Yoder as a nursing student, but noted that, "[b]ecause Yoder succeeds on her motion for summary judgment on nonconstitutional grounds, we need not address liability for damages under 42 U.S.C. § 1983." *Id.* at *7.

Defendants filed an appeal of the district court's order with this court, and on April 8, 2011, we vacated the district court's grant of summary judgment and remanded. *See Yoder v. Univ. of Louisville*, 417 F. App'x 529 (6th Cir. 2011) (unpublished). This court noted that Yoder had not alleged breach of contract, and found that the district court's decision was impermissible under Federal Rule of Civil Procedure 54(c). *Id.* at 530. We declined to affirm the grant of summary judgment on free speech and due process grounds because "the district court's judgment includes no consideration of these claims or their factual grounding." *Id.* (citations omitted).

On remand, both parties again filed cross-motions for summary judgment. On March 30, 2012, the district court granted Defendants' motion for summary judgment. The district court found that Yoder's claims against the University and Hern and Kiehl in their official capacities were barred by sovereign immunity, and further found that Kiehl and Hern were entitled to qualified immunity in their individual capacities. This appeal ensued.

**III.**

As a preliminary matter, Defendants contend that this court no longer has Article III jurisdiction because Yoder failed to preserve her claim for money damages by cross-appealing the district court's first grant of summary judgment in her favor, which declined to rule on her § 1983 claims. Defendants further assert that, in the absence of a claim for monetary relief, Yoder's claims for injunctive and declaratory relief are moot because she was reinstated as a student and has since completed her nursing degree.

**A.**

The district court did not expressly reach the issue of damages under 42 U.S.C. § 1983 and thus Yoder's claim for money damages is properly before this court. The district court stated in its first grant of summary judgment that its decision did not address liability for damages under § 1983: "This is not ultimately a free speech case. Nor is it fundamentally a matter of due process. There is no need, therefore, for the court to discuss the constitutional questions raised by Yoder's claim." Indeed, this court declined to affirm the district court's grant of summary judgment on constitutional grounds because "the district court's judgment includes no consideration of these claims or their factual grounding." *Yoder*, 417 F. App'x at 530. And, after this court remanded the case and Defendants raised the issue of waiver below, the district court held that, "[l]iability for damages under § 1983 was not addressed by this court," and found that there was "no failure to preserve a claim that was never addressed by the court below." Thus, Defendants' claim that Yoder waived her claim for monetary damages is mistaken. And, because Yoder's claim for monetary damages "ensures that this dispute is a live one and one over which Article III gives us continuing authority,"

9

*Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 387 (6th Cir. 2005) (citations omitted), the case is properly before this court.

**B.**

We agree, however, with the district court's conclusion that Yoder's claim for injunctive and declaratory relief against the University or Hern and Kiehl in their official capacities fails. It is not clear from Yoder's briefs what, if any, future action by Defendants Yoder hopes to preserve the right to enjoin. Yoder's injunctive claim for reinstatement is moot as a result of her graduation from the SON program. *See DeFunis v. Odegaard*, 416 U.S. 312, 319–20 & n.2 (1974) (per curiam) (holding a student's claim for injunctive relief against a law school moot when he registered for his last quarter, and the school said he would "be awarded his J.D. degree . . . regardless of the outcome of this appeal"); *Fialka-Feldman v. Oakland Univ. Bd. of Trustees*, 639 F.3d 711, 714 (6th Cir. 2011) (holding a student's claim for injunctive relief moot upon his graduation because university programs "tend to last longer than the time it takes to obtain a trial court ruling and an appeal, and accordingly the courts generally have not applied the capable-of-repetition exception to them"); *McPherson v. Mich. High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 458 (6th Cir. 1997) (en banc) (dispute over high school basketball player's eligibility for upcoming season was not "capable of repetition" when player graduated and there was "no reasonable expectation of another controversy over his eligibility"). Accordingly, we affirm the district court's grant of summary judgment as to the University and Hern and Kiehl in their official capacities.

**IV.**

We review a grant of summary judgment de novo. *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). "Summary judgment is appropriate where the evidence shows 'that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555, 560 (6th Cir. 2004) (quoting Fed. R. Civ. P. 56(c)). We must review the evidence in the "light most favorable to the party opposing the motion, giving that party the benefit of all reasonable inferences." *Smith Wholesale Co. v. R.J. Reynolds Tobacco Co.*, 477 F.3d 854, 861 (6th Cir. 2007) (citation omitted). However, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original).

Hern and Kiehl argue that they are entitled to qualified immunity. The qualified-immunity doctrine shields government officials performing discretionary functions from civil liability unless their conduct violates clearly established rights. *Barker v. Goodrich*, 649 F.3d 428, 433 (6th Cir. 2011) (citation and internal quotation marks omitted). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "The doctrine focuses on 'the objective reasonableness of an official's conduct, as measured by reference to clearly established law' to 'avoid excessive disruption of government and permit the resolution of many insubstantial

claims on summary judgment.'" *Andrews v. Hickman Cnty., Tenn*., 700 F.3d 845, 853 (quoting

*Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

In order to determine whether qualified immunity applies, this court must engage in a

two-step inquiry, addressing (1) whether, considering the allegations in a light most favorable to the

injured party, a constitutional right has been violated and (2) whether that right was clearly

established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Campbell v. City of Springboro, Ohio*, 700

F.3d 779, 786 (6th Cir. 2012). We may exercise our discretion in determining the order in which

to conduct this inquiry. *See Pearson*, 555 U.S. at 236–37.

## A. First Amendment Claim

We begin with Yoder's claim that Defendants violated her rights under the First Amendment

by dismissing her for the views expressed in the Blog. We exercise our discretion to focus on the

second prong of the qualified immunity inquiry—whether, assuming Yoder had a First Amendment

right to post the Blog that was violated by her dismissal from the SON, this right was clearly

established. Yoder has the burden of demonstrating that the law was clearly established at the time

of Defendants' challenged conduct. *Andrews*, 700 F.3d at 853 (citation omitted). For a right to be

clearly established, it "must be sufficiently clear that a reasonable official would understand that

what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). If school

administrators "of reasonable competence could disagree" on the lawfulness of the action,

Defendants are entitled to immunity. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Thus, "[t]he

relevant, dispositive inquiry in determining whether a right is clearly established is whether it would

be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202. The unlawfulness of the school administrator's action "can be apparent from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003) (citing *Hope v. Pelzer*, 536 U.S. 730, 740–41 (2002)). "When determining whether a constitutional right is clearly established, we look first to decisions of the Supreme Court, then to our own decisions and those of other courts within the circuit, and then to decisions of other Courts of Appeal." *Andrews*, 700 F.3d at 853.

We find dispositive the absence of controlling authority that specifically prohibits Defendants' conduct. Because neither the Supreme Court nor a panel of our circuit has considered whether schools can regulate off-campus, online speech by students, Yoder relies on *Layshock ex rel. Layshock v. Hermitage School District*, where the Third Circuit held that "the First Amendment prohibits the school from reaching beyond the schoolyard to impose what might otherwise be appropriate discipline." 650 F.3d 205, 207 (3d Cir. 2011) (en banc). We first observe that *Layshock* was not decided until June 2011—over two years after Yoder's dismissal—and thus cannot stand as clearly established law at the time of the incident. *See Mitchell v. Forsyth*, 472 U.S. 511, 528 (1985) (assessing whether the law was "clearly established" at the time the challenged actions occurred). More important, other circuits have come to conflicting conclusions and permitted schools to regulate off-campus, online student speech where such speech could foreseeably cause a material disruption to the administration of the school. *See Kowalski v. Berkeley Cnty. Schs.*, 652 F.3d 565, 572 (4th Cir. 2011) (upholding summary judgment in favor of a school that punished a

student for creating a MySpace page mocking a fellow student); *Doninger v. Niehoff*, 642 F.3d 334, 347 (2d Cir. 2011) (holding that it is not "clearly established that off-campus speech-related conduct may never be the basis for discipline by school officials"). Indeed, Yoder herself acknowledges that student internet communications present an "enigmatic issue, since these are communications available on campus, off campus, or anywhere else."

In addition, both parties rely heavily on Supreme Court cases that govern student speech standards,[3] none of which considers the unique circumstances posed here. Yoder has not identified any case—nor are we aware of any—that undermines a university's ability to take action against a nursing (or medical) student for making comments off campus that implicate patient privacy concerns. Defendants have legal and ethical obligations to ensure that patient confidentiality is protected, and that nursing students are trained with regard to their ethical obligations. *See, e.g.*, Ky. Rev. Stat. § 314.031(4)(d), (k); *id.* § 314.111. Yoder gained access to the Patient through the SON's clinical program, and patients allow SON students to observe their medical treatment in reliance on the students' agreement not to share information about their medical treatment and personal background. Under such circumstances, Defendants could not "fairly be said to 'know' that the law forb[ids] [discharging a student under these circumstances]." *Harlow*, 457 U.S. at 818.

Further, assuming Yoder had a First Amendment right to post the Blog online, it was not objectively unreasonable for Defendants to believe that Yoder affirmatively waived that right. The

---

[3]Yoder also contends that because the Supreme Court has not applied student-speech standards to "adult college students," such standards are inapplicable here. However, a recent panel of this court expressly held that school-speech standards may be applicable to university students. *See Ward v. Polite*, 667 F.3d 727, 733–34 (6th Cir. 2012).

Confidentiality Agreement states that Yoder "agree[d] to consider confidential *any and all information* entrusted to [her] throughout [her] clinical rotations while a student at the University of Louisville School of Nursing. This includes *medical*, financial, *personal*, and *employment related information*." The Confidentiality Agreement further notes that Yoder "understand[s] that a proven violation of confidentiality of any such information may be cause for immediate termination of access to further data and is grounds for immediate dismissal from the School of Nursing." The Blog discussed several medical, personal, and employment-related pieces of information related to the Patient, including:

- the date the Patient was in labor;

- the Patient was an employee of the hospital;

- the child born was the Patient's third child;

- the Patient was induced by oxytocin;

- the Patient received an epidural;

- the Patient vomited during labor;

- the Patient was in labor for 15 hours;

- the baby born to the Patient was a girl; and

- the Patient was married.

The Consent Form goes further than the Confidentiality Agreement by stating that information regarding a patient's "pregnancy and healthcare will be presented in written or oral form to the student's instructor only." Although Yoder contends that this agreement was for the Patient's benefit, Yoder was also required to sign the Consent Form, indicating that she was both aware of and

15

constrained by its limitations. The district court correctly noted that nothing about the language of the Consent Form suggests that the information that Yoder agreed not to disseminate was limited to confidential information. The patient-specific information in the Blog falls under the rubric of personal, professional, and medical information and discusses the Patient's "pregnancy and healthcare." Yoder cannot show that Defendants' reliance on the documents as a waiver of Yoder's First Amendment rights was objectively unreasonable in light of clearly established law.

Yoder also contends that for her waiver to be valid, it must be in the form of a "binding contract between the parties." Although a majority of cases considering constitutional waivers concern contractual obligations, *see, e.g., Snepp v. United States*, 444 U.S. 507 (1980) (per curiam) (considering a contract between the CIA and its former employee regarding publication rights); *D. H. Overmyer Co. v. Frick Co.*, 405 U.S. 174 (1972) (outlining the considerations relevant to determination of a contractual waiver of due process rights); *Fuentes v. Shevin*, 407 U.S. 67, 95 (finding no waiver of due process rights where the waiver was a contract that was "no bargaining over contractual terms between the parties who, in any event, were far from equal in bargaining power"), it is not clearly established that a waiver *must* come in contractual form. For example, in *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991), the Supreme Court addressed whether the First Amendment prohibits a plaintiff from recovering damages, under state promissory-estoppel law, for a newspaper's breach of a promise of confidentiality given to the plaintiff in exchange for information. *Id.* at 665. The Court allowed the claim to advance, despite "the absence of a contract, [which] creates obligations never explicitly assumed by the parties." *Id.* at 668. With this determination, the Court implicitly held that a party's voluntary promise to keep information

confidential constituted a valid waiver of First Amendment rights, even in the absence of an enforceable contract.

Accordingly, we hold that any First Amendment right allegedly violated by Defendants was not clearly established such that it would have been clear to Defendants that their actions were unlawful.

## B. Vagueness and Overbreadth

Yoder also asserts that the Honor Statement, Confidentiality Agreement, and Consent Form are unconstitutionally overbroad, and that the Consent Form is unconstitutionally vague.[4] As the Supreme Court recently observed, vagueness and overbreadth are distinct concerns: vagueness implicates the Due Process Clause, while overbreadth implicates the First Amendment. *See Holder v. Humanitarian Law Project*, 130 S. Ct. 2705, 2719 (2010).

Yoder challenges three SON policies—the Honor Code, the Confidentiality Agreement, and the Consent Form—as overbroad.[5] Under the traditional test for assessing restrictions on expressive

---

[4]Defendants argue that concepts of overbreadth and vagueness generally apply to *laws* that create a chilling effect on constitutionally-protected speech, not school policies. However, this court has previously considered vagueness and overbreadth challenges to school policies, including state university policies. *See, e.g., Savage v. Gee*, 665 F.3d 732 (6th Cir. 2012).

[5]The overbreadth doctrine provides an exception to the traditional rules of standing allowing Yoder to bring an action under the First Amendment based on a belief that the SON's policies are so broad or unclear that they will have a chilling effect. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) ("Litigants [ ] are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."); *Blau*, 401 F.3d at 390 ("In the context of First Amendment challenges, unlike most other areas of constitutional litigation, a claimant may seek protection not only on her own behalf but on behalf of others.").

conduct, a regulation (or in this case, a university policy) will be upheld if: "(1) it is unrelated to the suppression of expression, (2) it furthers an important or substantial government interest, and (3) it does not burden substantially more speech than necessary to further the interest." *Blau*, 401 F.3d at 391 (internal citations, quotation marks and brackets omitted). In attacking the SON's policies, Yoder bears the burden of demonstrating that the policies reach "a 'substantial' amount of protected free speech, 'judged in relation to the [policies'] plainly legitimate sweep.'" *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (quoting *Brodrick v. Oklahoma*, 413 U.S. 601, 615 (1973)). This high burden is in place because

> there comes a point at which the chilling effect of an overbroad law, significant though it may be, cannot justify prohibiting all enforcement of that law — particularly a law that reflects "legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct." For there are substantial costs *created* by the overbreadth doctrine when it blocks application of a law to constitutionally unprotected speech, or especially to constitutionally unprotected conduct. To ensure that these costs do not swallow the social benefits of declaring a law "overbroad," we have insisted that a law's application to protected speech be "substantial," not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications, before applying the "strong medicine" of overbreadth invalidation.

*Id.* at 119–20 (internal citations omitted). For this reason, "the mere fact that one can conceive of some impermissible applications of a [policy] is not sufficient to render it susceptible to an overbreadth challenge." *Mems. of the City Council of the City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). "Allegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm." *Laird v. Tatum*, 408 U.S. 1, 13–14 (1972).

The policies challenged by Yoder do not reach a substantial amount of protected speech, and Defendants have a compelling interest in ensuring that students observe patient confidentiality. The SON's decision to restrict the dissemination of patient information for purposes of teaching students about their confidentiality responsibilities, ensuring that patient information is not improperly released, and encouraging patients to participate in the teaching of the students are important and valid interests. Yoder has not established that the policies burden substantially more speech than necessary. Students are still permitted to discuss childbirth, pregnancy, or any other topic they wish; they are simply not permitted to do so in the context of a *specific* patient observed in conjunction with their clinical coursework.

Yoder also challenges the Consent Form as unconstitutionally vague.[6] However, this court has rejected vagueness challenges "when [a party's] conduct clearly falls within a statutory or regulatory prohibition." *Fowler v. Bd. of Educ. of Lincoln Cnty., Ky.*, 819 F.2d 657, 665 (6th Cir. 1987); *see also Humanitarian Law Project*, 130 S. Ct. at 2719 ("[A] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.") (citation omitted). As discussed above, the Blog clearly violates the Consent Form.

Assuming that Yoder is permitted to pursue a vagueness challenge to the Consent Form, her arguments are unavailing. Yoder must establish that "[the Consent Form's] prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable

---

[6]Yoder does not challenge the Honor Code or Confidentiality Agreement as unconstitutionally vague.

standard for inclusion and exclusion." *United Food & Comm. Workers Union Local 1099 v. Sw. Ohio Reg. Transit Auth.*, 163 F.3d 341, 358–59 (6th Cir. 1998) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).

The Consent Form is not unconstitutionally vague; it obligates students to refrain from sharing information about their clinical patients' pregnancy and health care with any person other than the instructor of the course. A person of ordinary intelligence would understand that posting information about a patient on MySpace.com, including a discussion of the patient's birthing process and medical procedures, would violate this policy. Indeed, that person would understand that the Consent Form requires that he or she not discuss patients' pregnancy or health care with any person besides the course instructor.

We therefore reject Yoder's claim that the policies she signed as part of the SON program are unconstitutionally overbroad or vague.

### C. Procedural Due Process Claim[7]

We next consider Yoder's assertion that Defendants violated her rights under the Fourteenth Amendment by failing to provide her adequate due process.[8] At the heart of Yoder's argument is

---

[7]Although Yoder states that Defendants violated her substantive due process rights, she fails to make any arguments in support of her claim. Moreover, as the district court correctly noted, this court has rejected the notion that substantive due process protects a medical or nursing student's interest in his or her continued enrollment. *See Rogers v. Tenn. Bd. of Regents*, 273 F. App'x 458, 463 (6th Cir. 2008); *Bell v. Ohio State Univ.*, 351 F.3d 240, 249–51 (6th Cir. 2003).

[8]To be entitled to the procedural protections of the Fourteenth Amendment, Yoder must demonstrate that her dismissal from the school deprived her of either a 'liberty" or a "property" interest. *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 82 (1978). Defendants do not dispute that Yoder's enrollment in the SON was a valid property interest, and we assume the same

the assertion that her dismissal from the SON was disciplinary, not academic. The Supreme Court recognizes a significant distinction between "the failure of a student to meet academic standards and the violation by a student of valid rules of conduct." *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 86 (1978) (holding that students are entitled to "far less stringent procedural requirements" for an academic, rather than a disciplinary, action). When a school takes action against a student for academic reasons, the due process afforded is minimal: a student is entitled only to notice that his or her academic performance was not satisfactory and a "careful and deliberate" decision regarding their punishment. *Id.* at 85; *Ku v. Tennessee*, 322 F.3d 431, 436 (6th Cir. 2003). In contrast, courts reviewing a disciplinary action must conduct a "more searching inquiry," *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 634 (6th Cir. 2005) (citing *Horowitz*, 435 U.S. at 86), and the student must be afforded both notice and a hearing, although the formality of the hearing will vary depending on the circumstances. *See Goss v. Lopez*, 419 U.S. 565, 581–84 (1975). This distinction is rooted in the Court's recognition that "[a]cademic evaluations of a student, in contrast to disciplinary determinations, bear little resemblance to the judicial and administrative fact-finding proceedings to which we have traditionally attached a full hearing requirement." *Horowitz*, 435 U.S. at 89. For this reason, "[w]hen judges are asked to review the substance of a genuinely academic decision . . . they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not

---

on appeal.

21

actually exercise professional judgment." *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985) (citations and footnotes omitted).

We again focus on the second prong of the qualified immunity assessment—whether, assuming that Yoder had a right to the due process procedures of a disciplinary dismissal instead of an academic dismissal, that right was clearly established. *Cf. Pearson*, 129 S. Ct. at 818–19. It was not. The term "academic" in this context is somewhat misleading. "Courts have frequently held that an academic dismissal may be properly based on more than simply grades, particularly in a medical-professional context. For example, in *Horowitz*, "the school warned [the plaintiff] that significant improvement was needed not only in the area of clinical performance but also in her personal hygiene and in keeping to her clinical schedules." 435 U.S. at 91 n.6. In concluding that the plaintiff was dismissed for purely academic reasons, the Court noted that "[p]ersonal hygiene and timeliness may be as important factors in a school's determination of whether a student will make a good medical doctor as the student's ability to take a case history or diagnose an illness." *Id.* This court reaffirmed that idea in *Ku*, noting "in the context of medical school, academic evaluations are not limited to consideration of raw grades or other objective criteria." 322 F.3d at 436; *see also Fenje v. Feld*, 398 F.3d 620, 625 (7th Cir. 2005) ("The nexus between [the plaintiff's] lack of candor in the application process and his capacity to be trusted with patient care clearly pushes this decision into the realm of an academic dismissal.").

Here, Yoder's compliance with the Honor Code, Confidentiality Agreement, and Consent Form was mandated as a condition of her enrollment in the upper division and participation in the clinical portions of the SON program. This indicates that the required conduct was a component of

22

Yoder's coursework, not part of a general student code of conduct. Defendants reasonably concluded that Yoder's apparent inability to keep patient information confidential was an important consideration in determining Yoder's suitability as a future nurse. Under such circumstances, Yoder cannot show that clearly established law required Defendants to treat her dismissal for violating patient confidentiality as disciplinary instead of academic.

We further find that Defendants were not objectively unreasonable in concluding that the processes used in Yoder's dismissal afforded Yoder adequate due process. As discussed above, the Supreme Court held that in cases of academic dismissal from a state educational institution, the requirements of due process are met when the student is fully informed of faculty dissatisfaction with his or her performance and the decision to dismiss the student is "careful and deliberate." *Horowitz*, 435 U.S. at 85; *Ku*, 322 F.3d at 436 ("[W]hen the student has been fully informed of the faculty's dissatisfaction with the student's academic progress and when the decision to dismiss was careful and deliberate, the Fourteenth Amendment's procedural due process requirement has been met. No formal hearing is required . . . ."); *see also Hlavacek v. Boyle*, 665 F.3d 823, 826 (7th Cir. 2011) ("Dismissals for poor academic performance 'require no hearing at all.'") (citation omitted). Here, by her own admission, Yoder received an explanation of why she was being dismissed. When she arrived at the meeting where she was dismissed, Kiehl expressed concern about the Blog, stated that she believed the Blog violated the Honor Code and patient confidentiality, and explained Yoder's punishment.[9] It was also not objectively unreasonable for Defendants to believe that their decision

---

[9]Indeed, Yoder also had prior notice from the Confidentiality Agreement that a violation of patient confidentiality "is grounds for immediate dismissal from the School of Nursing."

was "careful and deliberate." It is uncontested that Defendants reviewed the Blog, conferred with each other and the clinical instructor about the Blog's contents and implications, and jointly determined that the Blog violated the Honor Code, the standards of the profession, and the Confidentiality Agreement. Although a post-dismissal appeal hearing was not constitutionally required, Yoder availed herself of the University appeal process, where her dismissal was affirmed by the Committee. *See Rogers v. Tenn. Bd. of Regents*, 273 F. App'x 458, 463 (6th Cir. 2008) (a university's decision to dismiss a nursing student was "careful and deliberate" when it allowed her to engage in an appeal process); *Fenje*, 398 F.3d at 627 (decision was "careful and deliberate" with use of a post-termination hearing). Under such circumstances, it was not objectively unreasonable for Defendants to have believed that they provided Yoder with adequate due process procedures for an academic dismissal, and accordingly they are entitled to qualified immunity.

**V.**

For the reasons discussed above, we affirm the district court's grant of summary judgment.