EFiled:  Aug 22 2014 01:18PM EDT
Transaction ID 55927702
Case No. 9683-VCN

COURT OF CHANCERY
OF THE
STATE OF DELAWARE

JOHN W. NOBLE
VICE CHANCELLOR

417 SOUTH STATE STREET
DOVER, DELAWARE 19901
TELEPHONE: (302) 739-4397
FACSIMILE: (302) 739-6179

August 22, 2014

Elizabeth C. Fillingame, Esquire
Grady & Hampton, LLC
6 North Bradford Street
Dover, DE  19904

James D. Taylor, Jr., Esquire
Saul Ewing LLP
222 Delaware Avenue, Suite 1200
Wilmington, DE  19801

Re:    *Jenkins v. Delaware State University*
        C.A. No. 9683-VCN
        Date Submitted:  August 14, 2014

Dear Counsel:

Plaintiff seeks injunctive relief and monetary damages for due process and contractual violations resulting in her dismissal from the Nursing Program at Delaware State University.  Defendants argue that they respected all of Plaintiff's constitutional and contractual rights after she violated the Nursing Program Handbook and clinical course syllabus.[1]

---

[1] The parties agreed to submit their dispute to the Court for resolution on a paper record in lieu of trial.

* * *

Plaintiff Jordan Jenkins was a senior in the Nursing Program at Defendant Delaware State University ("DSU") in fall 2013. Dr. Marsha Horton, Dean of the College of Education, Health and Public Policy, and Dr. Carol Sando, then Chair of the Nursing Department, are also named defendants.

As part of a mandatory Community Health Nursing course, Ms. Jenkins participated in a clinical program at Dover Interfaith Mission for Housing ("Interfaith"), an off-campus homeless shelter for men.[2] Dr. Jodi Dampeer-Moore taught the lecture portion of the class, and Dr. Yvonne Stringfield supervised the clinical portion.[3] On October 10, 2013, Ms. Jenkins and her classmates reported to Interfaith for a clinical scheduled from 1:00-6:45 p.m.[4] Because only one resident arrived for a head-to-toe assessment by the students, Dr. Stringfield allowed the students to leave around 2:15 p.m. with instructions to return by 4:30 p.m.[5]

---

[2] Jenkins Dep. 47.
[3] Jenkins Dep. 35-36.
[4] Am. Compl. ¶ 11.
[5] Jenkins Dep. 61.

During the break, Ms. Jenkins and a number of her classmates went to Cheddar's where four students, including Ms. Jenkins,[6] ordered alcoholic beverages.[7] Ms. Jenkins ordered a strawberry margarita and drank half of it.[8] She returned to Interfaith at 4:30 p.m., made her presentation on a health topic sometime after 5:00 p.m., and left the site at 6:30 p.m.[9] Dr. Stringfield oversaw Ms. Jenkins that afternoon and "was not aware of any violation" of the Nursing Handbook policy on substance use.[10]

Dr. Dampeer-Moore first learned of the drinking on October 14, 2013 through a report from another student in the clinical.[11] A second student corroborated the allegation.[12] Dr. Dampeer-Moore discussed the allegations with Dr. Sando.[13] On October 15, 2013, the two invited Ms. Jenkins to Dr. Dampeer-Moore's office and asked Ms. Jenkins questions about the incident.[14] After Ms. Jenkins admitted ordering a drink, Dr. Dampeer-Moore and Dr. Sando

---

[6] Ms. Jenkins was 21 years old at the time.
[7] Horton Dep. 8.
[8] Jenkins Dep. 64, 72.
[9] Jenkins Dep. 64-65.
[10] Horton Dep. 53.
[11] Dampeer-Moore Aff. ¶ 5.
[12] *Id.*
[13] Dampeer-Moore Aff. ¶ 6.
[14] Dampeer-Moore Aff. ¶ 6; Jenkins Dep. 79-80.

informed Ms. Jenkins that she had violated the Nursing Department's rules, pointing specifically to the provision in the Community Health Nursing Syllabus that states, "Any student under the influence of any illegal medication or drug will automatically be dismissed from the course and program."[15] Dr. Sando then suspended Ms. Jenkins from classes and clinical, recommending that Ms. Jenkins research the definition of "under the influence."[16] Ms. Jenkins followed up the next day with an email attachment suggesting that her maximum blood alcohol content, assuming that she weighed 120 pounds and drank one margarita, would have been 0.03%.[17]

During the weekend of October 19, 2013, Ms. Jenkins received a letter of expulsion from Dr. Sando, dated October 16,[18] which stated:

> This letter provides formal notification of your dismissal from the course: NURS409 C Community Health Nursing Clinical and from the nursing program, as a result of your violation of the course syllabus rules of student conduct. As cited on page 10 [sic]: "Any student under the influence of any illegal medication or drug will

---

[15] Jenkins Dep. 82-83 (quoting from the course syllabus which appears as Exhibit E to the Defendants' Answering Brief). Email correspondence between Ms. Jenkins and Dr. Sando on October 18, 2013 confirms that they discussed this specific policy in the course syllabus. Pl.'s Opening Br. App. 3.

[16] Jenkins Dep. 83-84.

[17] Pl.'s Opening Br. App. 9-11.

[18] Jenkins Dep. 85.

> automatically be dismissed from the course and program." Furthermore, sanctions for students under the influence are stipulated in the Delaware State University Department of Nursing Handbook policy governing dismissal from clinical for students who exhibit "Suspicion of/evidence of substance abuse, use, influence or intoxication" (Pre-Licensure/ Baccalaureate Degree Key Information for New and Continuing Students Fall 2012-Spring 2013, p. 32).[19]

In addition, the letter informed Ms. Jenkins that the Nursing Department had forwarded the matter to the Student Judiciary Board for a hearing on violations of DSU's Student Code of Conduct.[20]  Dr. Sando suggested that Ms. Jenkins should choose a different major and meet with a faculty advisor to do so.[21]

On October 21, 2013, Ms. Jenkins, her mother, and her step-father met with Dr. Stringfield, Dr. Dampeer-Moore, Dr. Sando, and Dean Horton in multiple meetings.[22]  During the first meeting with Dean Horton, Ms. Jenkins misrepresented that she thought she had ordered a virgin drink and stopped

---

[19] Pl.'s Opening Br. App. 2.  There appears to be some confusion about the difference between the Key Information for New and Continuing Students referenced in the expulsion letter and the Nursing Program Handbook.  Horton Dep. 16-17.  The Court will refer to the Nursing Program Handbook, since the language relevant to the alleged violation is substantially the same in both documents.  *Compare* Pl.'s Opening Br. App. 59-60, *with* Defs.' Answering Br. Ex. D at 51-53.

[20] Pl.'s Opening Br. App. 2.  Ms. Jenkins has admitted to violating the Student Conduct Code and had been placed on probation until December 31, 2014.  Pl.'s Opening Br. App. 6-8.

[21] Pl.'s Opening Br. App. 2.

[22] Jenkins Dep. 94-97.

drinking once she realized it contained alcohol.[23]  Concerned that the "dismissal may have been unwarranted," Dean Horton contacted Dr. Dampeer-Moore and Dr. Sando "immediately" to schedule a second meeting that day.[24]  Ms. Jenkins later admitted that she had lied to Dean Horton and apologized.[25]  Nonetheless, Dean Horton agreed to reconsider the dismissal at Ms. Jenkins' parents' request.[26] Dean Horton later informed Ms. Jenkins in a letter, dated October 28, 2013, that her dismissal would be upheld.[27]

Dean Horton explained during the course of this litigation that Ms. Jenkins was ultimately dismissed "[f]or consuming alcohol while she was on duty which contributes to unsafe nursing practice."[28]  The Nursing Department conducts a mandatory student orientation at the beginning of each school year to review "the

---

[23] Horton Aff. ¶ 3.

[24] Horton Aff. ¶ 4.

[25] Horton Aff. ¶ 5.

[26] Horton Aff. Ex. A.

[27] Pl.'s Opening Br. App. 5.

[28] Horton Dep. 56-57.  In particular, "[b]y consuming alcohol while on duty, that opened the door for her behavior to be modified.  By consuming alcohol and then getting in a car and driving students back to a clinical site, [Ms. Jenkins] potentially put herself in danger and the others in the car.  By coming back to a site where . . . some of the clients are recovering alcoholics, there was the potential there for psychological or social harm." Horton Dep. 55.

rules and expectations of the Nursing Program."[29]  During the fall 2013 orientation, Dr. Dampeer-Moore "emphasized the Nursing Program's position that the use of alcohol or any substance (legal or not) that has the <u>potential</u> to impact a student's performance is strictly prohibited while the student is in, or preparing for, clinical."[30]  The Nursing Program Handbook states that "[a] nursing student may be dismissed from or not permitted to attend a clinical practice setting by nursing faculty responsible for directing the clinical learning experience"[31] for, among other reasons, "evidence of substance abuse, use, influence or intoxication."[32]  The Nursing Program Handbook informs that "[u]nsafe nursing practice" is reason for dismissal from the Nursing Program,[33] and "unsafe clinical performance" is reason for dismissal from the clinical and the Nursing Program.[34] No mention of "unsafe

---

[29] Dampeer-Moore Aff. ¶ 8.
[30] Dampeer-Moore Aff. ¶ 9 (emphasis in original).  Ms. Jenkins denies hearing this discussion, Jenkins Dep. 44, but has not provided evidence to challenge Dr. Dampeer-Moore's statement.
[31] Defs.' Answering Br. Ex. D at 51.
[32] Defs.' Answering Br. Ex. D at 53.
[33] Defs.' Answering Br. Ex. D at 38-39.
[34] Defs.' Answering Br. Ex. D at 51-52.

nursing practice" appears in any charging letters or written communication among Ms. Jenkins and the DSU faculty and administrators.[35]

By the time she received the October 28 letter upholding her dismissal from the Nursing Program, Ms. Jenkins had already withdrawn from DSU.[36] She applied to a number of other nursing schools and enrolled in Trinitas Nursing School.[37] She expects to graduate in December 2015 or May 2016.[38]

\* \* \*

Ms. Jenkins asks for reinstatement in the Nursing Program, eradication of judicial affairs records relating to the alcohol consumption incident, reinstatement of all scholarships, a class schedule permitting graduation by May 2015, enrollment in classes taught by other professors, placement in university housing, cancellation of the outstanding financial aid balance arising from her withdrawal,

---

[35] The Defendants' Answering Brief refers to Dean Horton's deposition and emphasizes that Dean Horton weighed Ms. Jenkins' alcohol consumption and subsequent actions in driving to and participating in clinical when deciding that Ms. Jenkins' conduct was "beneath the standard called for in department policy." Defs.' Answering Br. 16. While Dean Horton's deposition statements may accurately reflect Defendants' decision-making process, the record lacks explicit discussion of this reasoning until her July 7, 2014 deposition.

[36] Pl.'s Opening Br. App. 5; Jenkins Dep. 123.

[37] Jenkins Dep. 124-25.

[38] Jenkins Dep. 127.

an order of no retaliation, lost wages, attorneys fees, reimbursement for tuition paid to another institution, compensatory damages, and punitive damages.[39]

The threshold issue before the Court is whether Ms. Jenkins was dismissed on student discipline grounds or for academic reasons.[40] This determination is important because there is less process due and greater judicial deference warranted for academic dismissals. Once the type of dismissal is determined, the Court must decide whether Defendants provided sufficient notice and process to support Ms. Jenkins' dismissal from her clinical and the Nursing Program. If any violation is found, the final question is that of an appropriate remedy.

---

[39] Pl.'s Opening Br. 31-32.

[40] Ms. Jenkins also advances substantive due process, breach of contract, and contract interference claims. The Court does not address these claims because the procedural due process issue is dispositive, and Ms. Jenkins has not proved harm from any breach of contract that reinstatement does not address. First, the Student Judicial Handbook's disciplinary procedures do not apply to the Nursing Department's evaluation of academic qualification. Furthermore, although Ms. Jenkins may not have violated the disciplinary charge of "[o]ff-campus criminal acts involving possession and/or consumption of alcoholic beverages," Pl.'s Opening Br. App. 1, she admitted to a violation, waived a hearing, and accepted the consequences. Pl.'s Opening Br. App. 8. Finally, the Nursing Program Handbook clearly states that its provisions "do not constitute a contract." Defs.' Answering Br. Ex. D at 5. Defendants may have made mistakes in their dismissal process, but even if the handbooks are enforceable as contracts, Ms. Jenkins has not proved bad faith or separate harm.

\* \* \*

The Fourteenth Amendment guarantees that no state shall "deprive any person of life, liberty, or property, without due process of law."[41] One alleging violations of her Fourteenth Amendment right to due process must show that "(1) there has been a deprivation of liberty or property in the constitutional sense; and (2) the procedures used by the state to effect this deprivation were constitutionally inadequate."[42] The Supreme Court has assumed that public university students have a "constitutionally protectible property right in . . . continued enrollment" in their degree programs.[43] Generally, procedural due process requires "(1) notice and (2) an opportunity to be heard."[44] Constitutional due process differs for academic and disciplinary dismissals because "[a]cademic evaluations of a student, in contrast to disciplinary determinations, bear little

---

[41] U.S. Const. amend. XIV, § 1.

[42] *Studli v. Children & Youth & Families Cent. Reg'l Office*, 346 Fed. Appx. 804, 813 (3d Cir. 2009) (quoting *Callahan v. Lancaster–Lebanon Intermediate Unit 13,* 880 F. Supp. 319, 332 (E.D.Pa.1994)).

[43] *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 223 (1985). There is a mootness concern here because Ms. Jenkins withdrew from DSU before receiving Dean Horton's confirmation that her dismissal would be upheld. The Court will not address the issue as the parties have not focused on it.

[44] *Marsh v. Del. State Univ.*, 2006 WL 141680, at \*3 (D. Del. Jan. 19, 2006) (citing *Goss v. Lopez*, 419 U.S. 565, 575 (1975)).

resemblance to the judicial and administrative fact-finding proceedings to which we have traditionally attached a full-hearing requirement."[45]  Furthermore, in the medical program context, courts have held that schools can base an academic dismissal not only on pure academic merit but also on factors indicating that a student is not suited for the profession.[46]

Courts afford schools "great respect" and "may not override" academic decisions by faculty "unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment."[47]  Nonetheless, when a student is dismissed for academic reasons, the student must be "fully informed . . . of the faculty's dissatisfaction," and "the ultimate decision to dismiss" must be "careful and deliberate."[48]

---

[45] *Bd. of the Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 89 (1978).
[46] *See, e.g.*, *Yoder v. Univ. of Louisville*, 526 Fed. Appx. 537, 550 (6th Cir. May 15, 2013); *Fenje v. Feld*, 398 F.3d 620, 624 (7th Cir. 2005).
[47] *Ewing*, 747 U.S. at 225.
[48] *Horowitz*, 435 U.S. at 85.

A. *Was Ms. Jenkins Dismissed from the Nursing Program for Academic Reasons?*

Student dismissals generally fall into two categories: disciplinary and academic. The two categories may overlap. The documents informing Ms. Jenkins of the Nursing Department's concerns identified two matters. The first was an allegation of intoxication. It reads as an allegation of bad conduct and, thus, implicates discipline, but intoxication in certain circumstances could reflect badly upon a student's qualification to be a health care professional. Of course, in Ms. Jenkins' case, the allegation of intoxication is without factual support. The second issue went to the use of a "substance" during the clinical course. When read in light of Dr. Dampeer-Moore's orientation guidance regarding the need to refrain from alcohol consumption before and during a clinical course, the academic concerns become more obvious.

In addition, the charging document separately advised Ms. Jenkins that the matter was being referred to the Student Judiciary Board. This may suggest that the nursing faculty deferred to the student disciplinary process for the disciplinary aspect of Ms. Jenkins' conduct and thus was, for its own purposes, concerned about the academic aspects and implications of her conduct. This could be so even

though the text of the "charges" can readily be read as describing conduct worthy of discipline.

Defendants argue that the nursing faculty members dismissed Ms. Jenkins from the clinical course and the Nursing Program after exercising their academic judgment that Ms. Jenkins' consumption of part of a margarita constituted unsafe nursing practice.[49] They invoke *Board of the Curators of the University of Missouri v. Horowitz*, in which the Supreme Court noted that "[p]ersonal hygiene and timeliness may be as important factors in a school's determination of whether a student will make a good medical doctor as the student's ability to take a case history or diagnose an illness."[50] Courts have relied on this footnote for the proposition that academic dismissals from medical school may be based upon factors other than grades and test scores.[51]

The actions at issue include drinking half a margarita, driving classmates back to clinical, and participating in clinical. There is no evidence that Ms. Jenkins was intoxicated or violated any laws. The key reason why Ms. Jenkins' actions

---

[49] Defs.' Answering Br. 23-24.
[50] *Horowitz*, 435 U.S. at 91 n.6.
[51] *See, e.g.*, *Fenje*, 398 F.3d at 624; *Ku v. State of Tennessee*, 322 F.3d 431, 436 (6th Cir. 2003).

received scrutiny is that she was a nursing student offering care to members of the community on October 10, 2013. Given the faculty's express concern about any alcohol use, mentioned in the Nursing Program Handbook and the fall 2013 student orientation, and the deference owed to university faculty, Ms. Jenkins' dismissal was based on the faculty's judgment about her qualification to be a nurse. Thus, the Court finds that the Defendants dismissed Ms. Jenkins for academic reasons.

## B. *Was Ms. Jenkins Fully Informed of the Faculty's Dissatisfaction?*

Proceeding under the academic dismissal standard for due process, Defendants argue that Ms. Jenkins was fully informed because "orientation, class discussions, the Nursing Handbook, and course syllabi" put her on notice that she could not drink while on break from clinical.[52] Furthermore, Dr. Dampeer-Moore and Dr. Sando discussed with Ms. Jenkins the incident and their serious concern promptly after learning of her actions.[53] Ms. Jenkins contends that she did not receive notice of her alleged unsafe nursing practice and that the policies specified

---

[52] Defs.' Answering Br. 25.
[53] Dampeer-Moore Aff. ¶¶ 5-6.

in her dismissal letter did not support her dismissal from the Nursing Program.[54]

Due process for an academic dismissal requires that the plaintiff be fully informed of the faculty's dissatisfaction.[55] While some authority suggests that a student is "only entitled to notice on the grounds for the termination decision and an opportunity to respond" after the offense occurs,[56] other courts have required at least some prior notice that academic performance is inadequate.[57]

Although the record is far from clear, the Court accepts that the dismissal letter and meetings with faculty and administrators gave Ms. Jenkins notice that Defendants disapproved of her drinking on October 10, 2013. Dr. Dampeer-Moore's orientation warning about alcohol and the Nursing Program Handbook also can be read to put students on notice that any alcohol use during, or in preparation for, clinical is grounds for dismissal from a clinical course.

---

[54] Pl.'s Reply Br. 2.

[55] *Horowitz*, 435 U.S. at 85.

[56] *Fenje*, 398 F.3d at 624.

[57] *See, e.g.*, *Nickerson v. Univ. of Alaska Anchorage*, 975 P.2d 46, 53 (Alaska 1999) ("If the University's interests are truly academic rather than disciplinary in nature, its emphasis should be on correcting behavior through faculty suggestion, coercion, and forewarning rather than punishing behavior after the fact."). One court found a material issue of fact regarding whether a plaintiff was "fully informed" where an academic review board did not send a letter it had "resolved to send . . . indicating their dissatisfaction with her progress and outlining the consequences." *Zwick v. Regents of the Univ. of Mich.*, 2008 WL 1902031, at *6 (E.D. Mich. Apr. 28, 2008).

Admittedly, due process for student dismissals does not require the same level of precision in charging for a criminal matter.[58] Yet this Court is not able to find that a formal dismissal letter pointing to violations other than unsafe nursing practice, a syllabus referring to dismissal for illegal drug use, and a handbook stating that a student "may be dismissed from or not permitted to attend a clinical practice setting" for substance use[59] provide sufficient notice for Ms. Jenkins' dismissal from DSU's Nursing Program upon evidence that she had half a drink during a break from clinical. Additionally, there is no written record suggesting that Ms. Jenkins knew prior to litigation that her actions demonstrated to the faculty that she was unfit for the nursing profession. The Court therefore finds that Ms. Jenkins was not fully informed of the charges against her or the severity of the consequences and, therefore, she was not validly removed from the Nursing Program. Whether, given full information, Ms. Jenkins' actions would have been sufficient to exclude her from the Nursing Program is a question the Court does not reach.

---

[58]*See, e.g.*, *Nash v. Auburn Univ.*, 812 F.2d 655, 664 (11th Cir. 1987).

[59] Defs.' Answering Br. Ex. D at 51-53.

C. *Was the Faculty's Decision Careful and Deliberate?*

Next, Defendants argue that the decision to dismiss Ms. Jenkins was careful and deliberate because of the meetings and correspondence that occurred among several faculty members, administrators, Ms. Jenkins, and her parents.[60] In *Horowitz*, the decision was careful and deliberate because "'the school went beyond [constitutionally required] procedural due process by affording [respondent] the opportunity to be examined by seven independent physicians in order to be absolutely certain that their grading of the [respondent] in her medical skills was correct.'"[61] *Horowitz* does not require that same level of care, but persuasive authority suggests that the faculty must be objectively reasonable in complying with this second prong of the academic dismissal test.[62] Careful and deliberate action can occur through an opportunity to participate in an appeal or post-termination hearing, though one is not required.[63]

---

[60] Defs.' Answering Br. 25-26.
[61] *Horowitz*, 435 U.S. at 85 (alteration in original) (quoting *Horowitz v. Curators of the Univ. of Mo.*, 447 F. Supp. 1102, 1113 (W.D. Mo. 1975)).
[62] *Yoder*, 526 Fed. Appx. at 550-51.
[63] *Id.* at 551.

The meeting in which Dr. Dampeer-Moore and Dr. Sando asked Ms. Jenkins about the incident and the meeting in which Dean Horton agreed to reconsider Ms. Jenkins' dismissal were in effect hearings at which Ms. Jenkins offered her side of the events in question. There is no evidence that the faculty members were biased or rash in reaching their decision. Ms. Jenkins may not have had an opportunity to explain why her conduct did not demonstrate unfitness for the profession, but the Court does not address this issue because the academic dismissal standard already fails on the full information prong.

D. *Was Ms. Jenkins Duly Excluded from the Clinical Course?*

In contrast to dismissal from the Nursing Program, dismissal from the clinical was warranted by Ms. Jenkins' use of a "substance" in contravention of the Nursing Program Handbook, as elaborated upon during orientation. As to dismissal from the clinical course, she had sufficient notice. Perhaps some ambiguity can be found in the term "substance," and there may be a linguistic argument that alcohol is distinguished from other drugs, but a fair reading of the record demonstrates that alcohol is among the substances that must be avoided

during or before a clinical.[64] Ms. Jenkins drank part of a margarita while on break

and not on campus (or at the facility where the clinical took place), but her short

absence before returning to the clinical did not permit consumption of alcohol.

That there was no noticeable impairment is not the standard; DSU had made it

clear to its nursing students that consumption of alcohol and providing nursing

services are incompatible. Ms. Jenkins was on notice of this requirement; she

received fair notice of the faculty's concerns and of how her conduct violated the

applicable standards; she had a fair opportunity to review the matter with the Dean

and other faculty members; and there is no material dispute about her conduct at

Cheddar's. Thus, exclusion from the clinical for the duration of the semester was

both substantively and procedurally justified.[65]

E. *To What Relief is Ms. Jenkins Entitled?*

In conclusion, the Court determines that dismissal of Ms. Jenkins from the

Nursing Program was not justified, and Ms. Jenkins may not be excluded from the

---

[64] The Nursing Program Handbook states that "[s]tudents suspected of substance use will be required to take a drug or alcohol test." Defs.' Answering Br. Ex. D at 39. This text supports the conclusion that alcohol may be considered a "substance" for purposes of assessing both the conduct of nursing students and their fitness to serve as nurses.

[65] No contract that would undercut this conclusion has been cited.

Nursing Program based on the letters of October 16 and 28, 2013.[66] Preventing DSU from excluding Ms. Jenkins for the Nursing Program as a result of the academic process is an appropriate remedy for the procedural difficulties associated with DSU's removal efforts.[67] On the other hand, Ms. Jenkins has not demonstrated any material substantive or procedural shortcoming with respect to her dismissal from the clinical course.

In addition, Ms. Jenkins has not proved damages (including any tuition reimbursement and lost wages) or any reason to exclude the faculty members involved with the academic review process from serving as instructors of her classes.[68] Similarly, scholarships may not be denied to her based on her dismissal from the Nursing Program, but the Court does not have a sufficient record of continued entitlement to the scholarships otherwise to order their resumption. The rights to university housing, expungement of judicial affairs records, or any

---

[66] The Court does not ignore the judicial deference given to the academic decisions of faculty. The DSU Nursing Program faculty serves an important role in selecting the men and women qualified to serve the public as nurses, and this opinion should not be read to interfere with its professional judgment regarding student qualification.

[67] *See, e.g.*, *Goss v. Lopez*, 419 U.S. 565, 584 (1975).

[68] No evidence of bias or other improper motive on the part of the nursing faculty has been shown. Thus, ordering no retaliation is not necessary.

particular course schedule also were not established. Finally, the question of entitlement to attorneys' fees has not been adequately presented as of this time.[69]

**IT IS SO ORDERED.**

Very truly yours,

*/s/ John W. Noble*

JWN/cap
cc:    Register in Chancery-K

---

[69] Defendants raised a number of affirmative defenses. Answer ¶¶ 14-15. To the extent that the affirmative defenses were not briefed, the Court treats them as abandoned. It bears mention that the complaint does not fail for failure to state a claim. The Court awards only injunctive relief against DSU, rendering inapplicable the affirmative defenses of qualified and absolute immunity and failure to mitigate. Nor does the Eleventh Amendment bar this claim. Laches does not apply because the claim was filed timely, albeit in the wrong court, and Defendants did not suffer undue prejudice.