entitled to judgment as a matter of law on Ku's procedural due process claim.

Ku also challenges the College's action as a denial of his right to substantive due process. When reviewing the substance of academic decisions, courts "should show great respect for the faculty's professional judgment" and "may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment." *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985). "University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation." *Id.* at 225 n.11 (quoting *Horowitz*, 435 U.S. at 96 n.6 (1978) (Powell, J., concurring)).

Ku has not presented a shred of evidence that the College's actions constitute a substantial departure from accepted academic norms or were otherwise taken in bad faith. In fact, the unrefuted evidence in this case demonstrates that the faculty decisions culminating in the actions complained of were the result of focused professional judgment and careful deliberation during and after many months of observing and interacting with the plaintiff both in and out of the degree program. We find that the College's decision to remove Ku from third-year clinical rotations and require him to follow a particularized program of remediation before being allowed to reenter the third-year program was in no way arbitrary or capricious.

### III.

Because we find that Tennessee did not violate Ku's due process rights as a matter of law, we REVERSE the judgment of the district court and REMAND this case for entry of judgment in favor of Tennessee.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0075P (6th Cir.)
File Name: 03a0075p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

TZE-PONG "RAYMOND" KU,
    *Plaintiff-Appellee,*

    *v.*           Nos. 01-5886/6150

STATE OF TENNESSEE,
    *Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 00-00010—Thomas G. Hull, District Judge.

Argued: January 31, 2003

Decided and Filed: March 12, 2003

Before: MARTIN, Chief Circuit Judge; MERRITT and
LAY, Circuit Judges.

———————————

**COUNSEL**

**ARGUED:** Brandy M. Gagliano, OFFICE OF THE ATTORNEY GENERAL, Nashville, Tennessee, for

———————————

[*] The Honorable Donald P. Lay, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

Appellant.   Samuel W. Brown, BECKER, BROWN & KNIGHT, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Donald R. Ungurait, TENNESSEE ATTORNEY GENERAL & REPORTER, Nashville, Tennessee, for Appellant. Arthur F. Knight, III, BECKER, BROWN & KNIGHT, Knoxville, Tennessee, for Appellee.

———————————

## OPINION

———————————

MERRITT, Circuit Judge. In this § 1983 action, plaintiff Tze-Pong "Raymond" Ku claims that the State of Tennessee deprived him of his right to procedural due process when it placed him on leave of absence from his third year of studies at East Tennessee State University's James H. Quillen College of Medicine. The district court denied Tennessee's motion for summary judgment and instead granted summary judgment to the plaintiff. As remedy, the district court ordered Tennessee to readmit the plaintiff and permit him to resume his third-year rotations at the University and take the United States Medical License Examination Step 1 when he feels ready, as long as he passes it before beginning his fourth year. Tennessee appeals the district court's order on the merits and also on the ground that the state is protected by sovereign immunity under the Eleventh Amendment, even though the state did not raise the issue until the district court decided the case on the merits. We agree with the District Court on the Eleventh Amendment question, but we conclude that the College afforded Ku with more than adequate process in rendering its decision regarding his academic status and therefore reverse.

## I.

Tennessee raised the defense of Eleventh Amendment immunity for the first time before the district court in its motion for a stay pending appeal of the district court's order. Before that time, Tennessee appeared without objection to the district court's jurisdiction over this federal question and

under *Horowitz*, which holds that no more formal process is required for academic dismissals or suspensions than that the student is made aware of the faculty's dissatisfaction with his or her progress and the final decision was careful and deliberate. 435 U.S. at 85. Here, the Committee's recommendation and action were based on experienced faculty observation of Ku's classroom, test, and clinical performance as well as their academic judgment that a structured leave of absence would be the best course of action to improve his professional interactive skills and ensure his success in obtaining his medical degree within the prescribed time limits. By any account, the decision, reconsideration, and appeals were handled carefully, deliberately, and reasonably. We find that the procedures used throughout were sufficient under the Due Process clause of the Fourteenth Amendment and that Ku is not entitled to judgment as a matter of law.

The district court also denied Tennessee's motion for summary judgment. Even viewing the facts in the light most favorable to the plaintiff and drawing all reasonable inferences in his favor, we conclude that the evidence simply does not support Ku's otherwise unsubstantiated assertion that the Committee's decision "came out of the blue." In fact, his own deposition testimony indicates that he knew at least as early as his meeting with Dr. Wooten in April 1998 that he was on thin ice with the Committee, the faculty and his peers. On September 13, 1998, Dr. Hooks stated in her evaluation that Ku had a problem with his ability to focus and gave him a marginally average grade for his surgery rotation under her supervision. Moreover, as already noted, the College Handbook makes clear that the Committee reviews more than just grades or the fact that a student has a passing average. Ku was informed of the Committee's reasons for recommending a leave of absence by letter and was further given every opportunity to contest those reasons at the hearing. In sum, the undisputed facts, even accepting as true Ku's misapprehension of the pervasive faculty perception of his problems at the College, establish that Tennessee is

the Committee based its decision on Ku's failure to pass the Step 1 exam (a fact known to Ku) and Ku's continued difficulty interacting with faculty and peers. The Student Handbook clearly indicates that the Committee is authorized to consider USMLE Step 1 test scores along with the student's entire record when making recommendations related to an individual student's academic performance. (*Id.* § VIII, J.A. at 155.) The Committee is further authorized to recommend that a student be placed on leave of absence if, in the judgement of the Committee, the student is capable of completing the degree requirements if the student's problems are resolved. If the student disagrees, the student is afforded the opportunity to be heard before the Committee, at which time the Committee will consider "evidence of a student's performance and/or professional behavior and those factors applying directly to the student's ability to perform." A student dissatisfied with the Committee's recommendation or final action may directly appeal the decision to the dean. Finally, the Committee is empowered to formulate a remedial program, as well as take "any other action deemed appropriate for the individual student."

Ku was given—and he took—every opportunity to appeal the decision to the highest authorities at the College, during which time he was permitted to finish his psychiatry rotation. Ku met monthly with the Dean over a period of several months so they could together evaluate Ku's deficiencies and develop and implement a plan for dealing with the professional and academic rigors of medical school and studying for the Step 1 exam. Every indication is that Ku was given particularized professional attention by faculty members at all levels in an effort to protect patients while helping Ku improve his chances of success in medical school and as a medical doctor.

Having substantially, if not scrupulously, followed the College's procedures outlined in the Student Handbook in placing Ku on a leave of absence and then permitting him to reenter the curriculum subject to extensive remediation, the College clearly afforded Ku more than adequate process

defended the suit on the merits, engaging in substantial discovery and filing a motion for summary judgment. It was only after a final adverse ruling by the district court that Tennessee raised the Eleventh Amendment immunity defense. In considering the motion for stay, the district court ruled that Tennessee had waived its Eleventh Amendment immunity by appearing and defending the case on the merits.

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." By its decisions in two recent cases, one in 1998 and the other in 2002, it appears that the Supreme Court is moving in the direction of concluding that, in cases where the district court otherwise has original jurisdiction over the matter, the Eleventh Amendment immunity defense should be treated in the same way courts have traditionally treated personal jurisdiction rather than as a matter of subject matter jurisdiction.

In *Wisconsin Department of Corrections v. Schacht*, 524 U.S. 381 (1998), the Court addressed the question whether the presence of one federal claim barred by the Eleventh Amendment in an otherwise removable case destroys removal jurisdiction over the entire case. In holding that removal jurisdiction over the remaining claims is not destroyed, the Court distinguished between Eleventh Amendment immunity as a defense and the absence of original jurisdiction as a defense. *Id.* at 388-89. A federal court's original jurisdiction is created by statute enacted under Article III, which functions as a fundamental limit on federal power. Because it is a fundamental "subject matter" limitation on federal judicial power, a defect in a federal court's original jurisdiction need not be asserted by any party, cannot be waived by any party, and must be raised by a Court *sua sponte* when noticed. *Id.* In stark contrast to this concept of subject matter jurisdiction, "the Eleventh Amendment grants the State a legal power to assert a sovereign immunity defense should it choose to do so. The State can waive the defense. Nor need a court raise the

defect on its own.  Unless the State raises the matter, a court can ignore it."  *Id.* (citations omitted).

In a concurring opinion, Justice Kennedy "observe[d] that we have neither reached nor considered the argument that, by giving its express consent to removal of the case from state court, Wisconsin waived its Eleventh Amendment immunity." *Id.* at 393 (Kennedy, J., concurring).   Justice Kennedy recommended that the question be considered in a later case and proceeded to lay out his rationale for finding waiver by removal.  He first described the Court's inconsistent Eleventh Amendment jurisprudence regarding waiver as a "departure from the usual rules of waiver stem[ming] from the hybrid nature of the jurisdictional bar erected by the Eleventh Amendment."  *Id.* at 394 (Kennedy, J., concurring).  On the one hand, "permitting the immunity to be raised at any stage of the proceedings . . . is more consistent with regarding the Eleventh Amendment as a limit on the federal court's subject matter jurisdiction."  *Id.* (Kennedy J., concurring).  On the other, "the immunity bears substantial similarity to personal jurisdiction requirements, since it can be waived and courts need not raise the issue *sua sponte*."  *See Id.* (Kennedy, J., concurring).  The unfair result of the "hybrid nature" of the waiver rule, Justice Kennedy noted, is that "[i]n permitting the belated assertion of the Eleventh Amendment bar, we allow States to proceed to judgment without facing any real risk of adverse consequences."  *Id.* at 394 (Kennedy, J., concurring).  Justice Kennedy offered a broad suggestion to eliminate this unfairness and inconsistency in the future:

> The Court could eliminate the unfairness by modifying our Eleventh Amendment jurisprudence to make it more consistent with our practice regarding personal jurisdiction.  Under a rule inferring waiver from the failure to raise the objection at the outset of the proceedings, States would be prevented from gaining an unfair advantage.

*Id.* at 395 (Kennedy, J., concurring).  Recognizing that such a rule would constitute a "substantial revision" of the Court's

We agree with Ku that the record does not demonstrate any disciplinary wrongdoing on Ku's part.  Nevertheless, there can also be no doubt that in the context of medical school, academic evaluations are not limited to consideration of raw grades or other objective criteria.  *See Board of Curators of the Univ. of Mich. v. Horowitz*, 435 U.S. 78, 89-90 (1978).  Despite the defendant's arguments and the district court's apparent determination that the College's decision to place Ku on leave of absence was neither an academic decision nor a disciplinary decision, we conclude that the decision was an academic one.  The Student Handbook, upon which Ku relies as evidence of his constitutionally protectible property interest, makes clear that

> [e]valuation of academic performance may include (but is not necessarily limited to) measuring the student's knowledge, testing how the student applies such knowledge to specific problems, evaluation of the judgement a student employs in solving problems and assessing the quality of the student's psychomotor skills, ethical behavior and interpersonal relationships with medical colleagues, patients and patient's families.

(Student Handbook § IX.F, J.A. at 157.)

In the case of an academic dismissal or suspension from a state educational institution, when the student has been fully informed of the faculty's dissatisfaction with the student's academic progress and when the decision to dismiss was careful and deliberate, the Fourteenth Amendment's procedural due process requirement has been met.  *See Horowitz*, 435 U.S. at 85-86.  No formal hearing is required for academic decisions because such academic decisions "require[] an expert evaluation of cumulative information and [are] not readily adapted to the procedural tools of judicial or administrative decisionmaking."  *Id.* at 91.

Although Ku maintains that the decision "came out of the blue," the record indicates that he knew of his precarious status with the faculty and was fully informed of the Committee's recommendation by letter, which indicated that

place him on leave of absence and then to readmit him to the College subject to certain conditions were constitutionally inadequate.

In the spring of his second year at the College, Ku came to the attention of the Student Promotion Committee because he was failing two courses. Ku met with Dr. Daniel Wooten, Executive Associate Dean for Academic and Faculty Affairs at the College, who expressed dissatisfaction with Ku's failing grades and certain other "unprofessional" conduct. At the meeting, Dr. Wooten "promised that he would kick [Ku] out if [he didn't] shape up." (Ku Dep., J.A. at 325.) Ku eventually passed the courses, finishing his second year with only marginal overall success. Over the summer, Ku failed the USMLE Step 1 exam. In the fall of his third year, one of Ku's clinical professors provided a negative report to the Committee regarding Ku's lack of medical and scientific knowledge, his inability to process and apply what knowledge he did have, and his inability to interact with others in a basic professional manner. Taking this and his past performance into consideration, as well as the possible risk to patients in the clinical setting, the Committee notified Ku that it recommended that he be placed on immediate leave of absence. Dr. Wooten accepted the recommendation.

After an appeals hearing, the Committee affirmed its earlier decision. The decision was subsequently affirmed by the Dean of the College and the President of the University. During and after the appeals process, Ku was allowed to complete his psychiatry rotation. While on leave of absence, Ku met monthly with the Dean to monitor his progress in addressing his deficiencies. The next fall, the Committee determined that Ku should be readmitted, but only on the condition that he repeat the second year medical school curriculum by attending all classes and passing oral exams at the end of each semester. The Committee would then determine his readiness to sit for the Step 1 exam and resume his clinical rotations.

waiver jurisprudence in order to find waiver by removal, Justice Kennedy offered the narrower rule that removal is a form of voluntary invocation of a federal court's jurisdiction sufficient to waive the defense under the principle established by the Supreme Court in *Clark v. Barnard*, 108 U.S. 436, 447-48 (1883) (holding that when a State voluntarily intervenes in a federal court action to assert its own claim, its actions constitute a waiver of the Eleventh Amendment immunity); *Gunter v. Atlantic Coast Line Railroad Co.,* 200 U.S. 273, 284 (1906) ("[W] here a State voluntarily becomes a party to a cause and submits its rights for judicial determination, it will be bound thereby and cannot escape the result of its own voluntary act by invoking the prohibitions of the Eleventh Amendment."); and *Gardner v. New Jersey*, 329 U.S. 565, 574 (1947) (finding waiver of the Eleventh Amendment when a State voluntarily appeared in bankruptcy court to file a claim against a common fund). *Schact*, 524 U.S. at 395-96 (Kennedy, J. concurring).

Two years later in *Lapides v. Board of Regents of the University System of Georgia*, 122 S. Ct. 1640 (2002), the Supreme Court adopted Justice Kennedy's reasoning regarding removal and held that a State that was initially brought involuntarily into a case as a defendant in state court on both state and federal claims, but then voluntarily removed the case to federal court, may not turn around and invoke the Eleventh Amendment as a defense to suit in federal court. The Court explained that

> an interpretation of the Eleventh Amendment that finds waiver in the litigation context rests upon the Amendment's presumed recognition of the judicial need to avoid inconsistency, anomaly, and unfairness, and not upon a State's actual preference or desire, which might, afer all, favor selective use of "immunity to achieve litigation advantages.

*Id.* at 1644. Thus, the search for a "clear indication" of a State's intent to waive in the litigation context "must focus on the litigation act the State takes that creates the waiver." *Id.*

By taking the litigation act of voluntarily agreeing to remove the case to federal court, "[the State] voluntarily invoked the federal court's jurisdiction." *Id.* Nor could the State, through its attorney general, invoke the federal court's jurisdiction and then turn around and claim that the attorney general lacked statutory authority to waive the State's immunity in federal court, as the Court had held permissible in *Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 469 (1945) (permitting a State to regain Eleventh Amendment immunity by showing the attorney general's lack of authority to waive even after it had litigated a case brought against it in federal court). Citing the problems of "inconsistency and unfairness that a contrary rule of law would create," the Court overruled *Ford* insofar as it might otherwise apply to the affirmative litigation action of voluntary removal. In sum, "removal is a form of voluntary invocation of a federal court's jurisdiction sufficient to waive the State's otherwise valid objection to litigation of a matter (here of state law) in a federal forum." *Lapides*, 122 S. Ct. at 1646.

Although it is clear that the Court in *Lapides* adopted Justice Kennedy's rationale in *Schacht* regarding voluntary removal, it did not go so far as either to accept or reject his broader suggestion to treat the Eleventh Amendment immunity defense as one, like the defense of lack of personal jurisdiction, that can be permanently waived when a State fails to raise the objection at the outset of proceedings. Nevertheless, by creating a clear rule of waiver by removal, the Supreme Court has unequivocally rejected the view that, in cases over which the federal court otherwise has original jurisdiction, the additional "jurisdictional bar" erected by the Eleventh Amendment should be treated as a matter of "subject matter" jurisdiction rather than "personal" jurisdiction. To say that voluntary removal constitutes a clear waiver is inconsistent with treating Eleventh Amendment immunity as a matter of subject matter jurisdiction. Instead, the rule is consistent only with the view that the immunity defense in cases otherwise falling within a federal court's original jurisdiction should be treated like the defense of lack of personal jurisdiction. This rule is a strong indication that

the Supreme Court will adopt Justice Kennedy's broader suggestion to "eliminate the unfairness" and inconsistency by making the Eleventh Amendment waiver rule "consistent with [the Court's] practice regarding personal jurisdiction." *Schacht*, 524 U.S. at 395. Otherwise, the confusion regarding the proper analysis under any given set of facts will continue to lead to unfair and inconsistent results.

Here, Tennessee was initially brought in involuntarily as a defendant in a case in which the plaintiff, also a citizen of Tennessee, seeks injunctive relief for an alleged violation of 42 U.S.C. § 1983. Instead of asserting its Eleventh Amendment immunity defense, Tennessee engaged in extensive discovery and then invited the district court to enter judgment on the merits. It was only after judgment was adverse to the State that it revealed that it had its fingers crossed behind its metaphorical back the whole time. In our view, this type of clear litigation conduct creates the same kind of "inconsistency and unfairness" the Supreme Court was concerned with in *Lapides*. Following the rationale of Justice Kennedy in *Shacht* and the only consistent view of the line of authority endorsed in *Lapides*, we hold that appearing without objection and defending on the merits in a case over which the district court otherwise has original jurisdiction is a form of voluntary invocation of the federal court's jurisdiction that is sufficient to a waive a State's defense of Eleventh Amendment immunity. Accordingly, Tennessee may not now avail itself of the defense.

## II.

Turning to the merits, we will assume without deciding that Raymond Ku has a constitutionally protectible property interest in continuing his medical studies under Tennessee law. *See State ex rel. Sherman v. Hyman*, 171 S.W.2d 822, 826 (Tenn. 1942); *see also Stevens v. Hunt*, 646 F.2d 1168, 1169 (6th Cir. 1981) (citing *Sherman* for the proposition that a student's interest in continuing medical school is a "qualified property interest" under Tennessee law). Next, we address Ku's claim that the procedures used by the College to