**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 18a0556n.06

Case No. 18-1046

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED

Nov 05, 2018

DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| JOHN MBAWE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE WESTERN DISTRICT OF |
| FERRIS STATE UNIVERSITY, et al., | ) | MICHIGAN |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE: SILER, GRIFFIN, and STRANCH, Circuit Judges.

SILER, Circuit Judge. When John Mbawe was a pharmacy student at Ferris State University (FSU), he began suffering from paranoid delusions. He believed people were spying on him, following him, and injecting him with foreign substances while he slept. Eventually, a state court granted FSU's petition to have Mbawe involuntarily committed to a psychiatric hospital. Mbawe's commitment rendered him ineligible to maintain his pharmacy-intern license, required for pharmacy students, so FSU withdrew Mbawe from the pharmacy program.

Mbawe filed this suit, claiming that the university and certain administrators (collectively, FSU) unlawfully discriminated against him, in violation of Title II of the Americans with Disabilities Act (ADA) and § 504 of the Rehabilitation Act, and deprived him of adequate Fourteenth Amendment procedural due process, in violation of 42 U.S.C. § 1983. The district

court granted summary judgment in FSU's favor, holding that the university did not violate Mbawe's statutory or constitutional rights. We AFFIRM.

I.

Mbawe was admitted to FSU's pharmacy program in 2010. He entered the program on a remedial track, which meant that he had four years to complete his coursework instead of the usual three. After his first year, he was academically dismissed for failing to maintain a 2.0 GPA, but he was reinstated after a successful appeal.

As the fall 2013 semester approached, FSU officials grew concerned about Mbawe's mental health. That summer, Mbawe visited FSU's Birkam Health Center (BHC) and told Dr. Susan Davis he was being "targeted" by people who were monitoring his movements. He claimed these people had put a liquid on his car and on his left arm that caused his skin to darken, but lab work revealed no abnormalities. Dr. Davis noted that Mbawe appeared "rational and logical" and said he was "genuinely upset and disturbed about his suspicions."

Mbawe began missing classes soon after the semester began. His professors expressed concern that he was apparently unable to comprehend his schedule and course requirements. Dr. Jeffrey Bates, the pharmacy program's Student Services Coordinator, spoke with Mbawe several times. Mbawe told Dr. Bates that people had been injecting him while he slept, and added that "someone was using cameras to spy on him."

On September 16, an FSU student found three handwritten notes in a university restroom. The first note contained details regarding travel plans that Mbawe had abandoned. The other two notes contained several statements reflecting Mbawe's belief that he was in danger. Specifically, Mbawe wrote that people had placed cameras in his apartment and had injected him while he slept.

The notes also said that "[t]hey are killing me for nothing," and "I know I will die for what they have on my body."

After receiving a photograph of the notes, Dr. Bates called Mbawe, who confirmed that the notes belonged to him. Dr. Bates encouraged Mbawe to visit the BHC counseling center, but he refused and said he did not need counseling. Mbawe did, however, agree to see Dr. Davis again.

Mbawe visited BHC on September 19 and was seen by Nurse Melissa Sprague. He maintained his belief that people were coming into his apartment, poisoning his food, and injecting things into his body. Nurse Sprague noted that Mbawe had a mental disorder but was "not in any way threatening or bizarre with his behavior." Following his visit, another BHC nurse reported to Dr. Bates that Mbawe was "rational" but "unwilling to see a psychiatrist," and was "not a threat to others or himself."

The next day, Mbawe went to BHC's counseling center and met with Thomas Liszewski, a limited licensed psychologist. Mbawe told Liszewski that he was being bullied by three other pharmacy students who were injecting him with poison while he slept and that the FSU police refused to investigate. Liszewski spoke with FSU Officer Saunders who said that Mbawe "was schizophrenic and needed to be hospitalized but he was not an eminent [sic] threat to himself or anyone else." Liszewski consulted with a colleague and the two "mutually agreed" that they did not have "any right to do anything else." Mbawe rebuffed Liszewski's suggestion that he go to a mental-health center or the emergency room. Liszewski's notes from the meeting describe Mbawe as "quite friendly and rational" and as someone with a low risk for suicide or homicide.

Renee Vander Myde, the BHC director, eventually became aware of Mbawe's difficulties. She and other FSU officials decided to convene a Behavioral Review Team (BRT) to discuss possible courses of action. According to FSU, a BRT is "a forum for faculty, staff, and students

to report observed behaviors of any person within the University community that warrant serious concern."

The BRT met on September 23. Vander Myde and Dr. Bates attended, along with several other FSU officials: Kenneth Plas, an attorney from the general counsel's office; Leroy Wright, Dean of Students; James Cook, Assistant Director of the Department of Public Safety; and Dr. Wendy Samuels, a social work professor. Vander Myde told the BRT she was concerned with Mbawe's mental health and recounted his allegations of people trying to poison him. She also reported that "[b]oth Dr. Davis and Tom Liszewski stated that John was very kind and did not display any aggressive behavior toward them." Dr. Bates similarly stated that "he had not seen any alarming behavior from [Mbawe] until recently when John shared his fear regarding the injections." Dr. Bates also shared that Mbawe was struggling academically because of his absences and was close to being dismissed from the pharmacy program.

The BRT discussed several options, including whether a medical withdrawal would be appropriate. Dr. Bates said he had suggested to Mbawe that he medically withdraw, but Mbawe was not interested. The meeting ended with Vander Myde stating that she would contact Network 180, a mental health facility in Grand Rapids, to see if they had any history with Mbawe.

At 11:00 a.m. on September 24, Vander Myde emailed the BRT. In her opinion, Mbawe needed "intervention for his own well-being and because of the concerns we discussed yesterday regarding the potential for violence when someone experiences these types of thought processes and who has already exhibited some degree of aggression/anger/frustration related to the pattern of thinking." Vander Myde stated that in order to file a petition for involuntary commitment, someone had to have been in contact with Mbawe within the previous forty-eight hours.

Sometime between 11:00 a.m. and 11:39 a.m., Vander Myde, herself a limited licensed psychologist, spoke with Mbawe on the phone. Following that conversation, Vander Myde told the BRT Mbawe "is still delusional and wants the school to get the police to investigate. He continues to refuse getting help other than getting police to investigate the poisoning he claims to be getting."

That same day, Vander Myde submitted a petition for hospitalization to the Kent County Probate Court. Vander Myde averred that Mbawe's "refusal to get help," as well as his refusal "to eat and his delusions/paranoia [were] putting him at risk of self harm and potentially harm to others." Soon thereafter, Vander Myde informed the BRT that the state judge had considered the petition and ordered Mbawe to be hospitalized for a psychiatric examination.

One week later, on October 1, Grand Rapids police located Mbawe in class at FSU. Officers took him into custody, and he was eventually hospitalized at Pine Rest Christian Mental Health Services. Two physicians concluded that Mbawe had a mental illness and recommended that he be kept for treatment.

On October 10, the state probate court held a hearing regarding Mbawe's hospitalization. Mbawe was present with counsel. Vander Myde, Mbawe, and Dr. Verle Bell, a staff psychiatrist from Pine Rest, all testified. Following the hearing, the probate court found by clear and convincing evidence that Mbawe was a person requiring treatment under Michigan's mental health code and ordered that he be hospitalized for no longer than sixty days. The probate court's commitment order established that Mbawe had a "mental illness," defined as a "substantial disorder of thought or mood that significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life." Mich. Comp. Laws §§ 330.1400(g), 1401.

The next day, Vander Myde, Dr. Bates, and Dr. Stephen Durst (Dean of the College of Pharmacy) began to discuss Mbawe's future in the pharmacy program. Of particular concern was their belief that Mbawe's involuntary commitment for a mental illness rendered him ineligible to continue his studies. FSU's "Technical Standards" for pharmacy students require, among other things, that a student "possess the emotional and mental health required for full utilization of their abilities" and also "obtain and maintain a valid Pharmacist Intern license in the State of Michigan." Michigan's Department of Licensing and Regulatory Affairs (LARA), the agency in charge of pharmacist licensure, is obligated by statute to investigate and possibly take disciplinary action against a licensee who has a "condition that impairs, or may impair, the ability to safely and skillfully engage in the practice of the health profession." *Id.* § 333.16221(a). Such a condition may consist of a "[m]ental . . . inability reasonably related to and adversely affecting the licensee's . . . ability to practice in a safe and competent manner." *Id.* § 333.16221(b)(iii). And FSU was obligated by statute to report Mbawe's involuntary commitment to LARA. *Id.* § 333.16222(1). Thus, Dr. Bates and Dean Durst recognized that Mbawe's mental illness placed his pharmacy-intern license at risk. And without that license, Mbawe could not comply with the pharmacy program's Technical Standards.

Dr. Bates and Dean Durst were also concerned that Mbawe had missed too much coursework to allow him to successfully complete his classes that semester. Because Mbawe was already on a remedial track, he would have been academically dismissed if he had failed any of his classes. This would have made it difficult, if not impossible, for Mbawe to return to the pharmacy program in the future.

Following internal deliberations among Dr. Bates, Dean Durst, Vander Myde, Wright, and the general counsel's office, FSU officials decided to withdraw Mbawe from the university for

medical reasons. FSU claims that this route was preferable to outright dismissal because it "would allow Mr. Mbawe the opportunity to apply for readmission," it "would not negatively impact Mr. Mbawe's GPA," and it "would also give Mr. Mbawe the additional time that he would need to finish his third-year classes that other alternatives would not." But FSU policy required that a student, not the university, initiate a medical withdrawal. Nevertheless, on October 15, Dr. Bates emailed Vander Myde and asked that Mbawe be medically withdrawn from the university.

Mbawe was discharged from Pine Rest on October 16. That same day, he contacted two of his professors asking to make up lost work but was told that he had been withdrawn and that he should contact the dean's office. On October 17, Mbawe met with Dr. Bates and Dean Durst. They informed Mbawe that he had been withdrawn from the pharmacy program because he was no longer in compliance with the program's Technical Standards.

Mbawe appealed his withdrawal to the provost's office on October 21. On October 22, Dean Durst emailed Dr. Paul Blake, the Associate Provost of Academic Affairs. Dean Durst stated that he and Dr. Bates believed that overturning Mbawe's medical withdrawal would place him at risk of academic dismissal, which would make it more difficult for Mbawe to gain readmission to the pharmacy program in the future.

On October 22, Dr. Bates emailed Mbawe's four professors to inquire whether Mbawe could pass his classes if he was given excused absences from October 1 onward. None of the professors answered Dr. Bates' question definitively; they provided answers ranging from "theoretically possible" to "if I was forced to choose pass or fail I would have to say fail."

Dr. Blake, Dean Durst, and Dr. Bates met with Mbawe on November 5. They informed Mbawe that his appeal had been denied and his withdrawal would stand. At Mbawe's request, Dr. Blake provided Mbawe with a formal letter explaining the three reasons his appeal was denied: he

had missed too much class to successfully complete his courses, he was at risk of being academically dismissed if he was not medically withdrawn, and his pharmacy intern licensure had been compromised.

In his letter, Dr. Blake made clear that "[t]he next steps for re-engagement in the Pharmacy Program are to gain clearance from HPRP and reapply to the University and the Pharmacy Program." HPRP, the Michigan Health Professionals Recovery Program, is "a non-disciplinary program designed to assist participants recover from substance abuse or mental health problems." Following their October 17 meeting, Dr. Bates had spoken with HPRP officials, and they advised him that Mbawe likely met the statutory definition of "impaired" and would possibly need to receive a psychiatric evaluation and enter into a monitoring agreement to maintain his pharmacy intern license. Dr. Bates formally referred Mbawe to HPRP on November 4, the day before Mbawe learned his appeal was denied.

At HPRP's urging, Mbawe eventually submitted to a psychiatric examination in January 2014. The HPRP psychiatrist observed that Mbawe suffered from "delusional belief and some paranoid psychotic behaviors," had not been taking his prescribed medication, and had no "insight into his illness or treatment need." She concluded that Mbawe could not return to practice until his condition was stable and until he entered a monitoring agreement with HPRP and restarted his medication.

HPRP concurred and sent Mbawe a proposed monitoring agreement to sign. Among other things, the proposed agreement required him to participate in regular therapy sessions. Mbawe received the agreement and met with Dean Durst, Dr. Blake, and Dr. Bates on March 11. According to Mbawe, the FSU officials promised that he would be readmitted to the pharmacy

program if he signed the monitoring agreement. But Mbawe was dissatisfied with the proposed agreement because it misidentified him as a registered pharmacist, rather than a pharmacy student.

In any event, Mbawe failed to sign the monitoring agreement before the March 11 deadline, so HPRP closed its file and reported Mbawe to LARA. In turn, LARA filed an administrative complaint against Mbawe and summarily suspended his license. Mbawe did not respond to the complaint. Ultimately, LARA issued a final order on October 2, suspending Mbawe's license for a minimum of six months and a day under Mich. Comp. Laws § 333.16221(b)(iii).

Mbawe then filed a complaint with the Department of Education's Office of Civil Rights (OCR). OCR eventually concluded that FSU unlawfully discriminated against Mbawe because of a mental disability.[1] This suit, against FSU, Vander Myde, and Drs. Durst, Bates, and Blake, followed.

Following discovery, the district court granted summary judgment in FSU's favor. The court held that Mbawe's ADA and § 504 claims failed because he was not "otherwise qualified" to continue his studies in the pharmacy program, with or without a reasonable accommodation. The court also held that, because Mbawe's dismissal was academic rather than disciplinary, FSU did not deprive Mbawe of adequate procedural due process by failing to afford him a formal hearing prior to withdrawing him from the program.[2]

---

[1] Neither party asserts that OCR's findings are entitled to any sort of binding, preclusive, or persuasive effect in this action.

[2] The district court also held that FSU did not violate Mbawe's substantive due process rights because his disability did not make him part of a suspect class and FSU had a rational basis for its decision. Mbawe does not contest that holding on appeal and has therefore waived his substantive due process claim. *See Robinson v. Jones*, 142 F.3d 905, 906 (6th Cir. 1998).

II.

We review a district court's grant of summary judgment de novo, "construing the evidence and drawing all reasonable inferences in favor of the nonmoving party." *Rocheleau v. Elder Living Constr., LLC*, 814 F.3d 398, 400 (6th Cir. 2016) (citation omitted).

III.

A.

Mbawe first claims that FSU discriminated against him in violation of Title II of the ADA and § 504 of the Rehabilitation Act.[3] Those statutes "allow[] disabled individuals to sue certain entities . . . that exclude them from participation in, deny them benefits of, or discriminate against them in a program because of their disability." *Gohl v. Livonia Pub. Schs.*, 836 F.3d 672, 681 (6th Cir. 2016).

Because Mbawe brings forth no direct evidence of discrimination, the familiar *McDonnell Douglas* burden-shifting framework applies. *Id.* at 682; *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). Mbawe must first establish "that he (1) is disabled under the statutes, (2) is 'otherwise qualified' for participation in the program, [] (3) 'is being excluded from participation in, denied the benefits of, or subjected to discrimination' because of his disability or handicap, and (4) (for the Rehabilitation Act) that the program receives federal financial assistance." *Id.* (quoting *G.C. v. Owensboro Pub. Schs.*, 711 F.3d 623, 635 (6th Cir. 2013)). If Mbawe makes out a prima facie case, "the burden shifts to the school to offer a legitimate, nondiscriminatory reason for its actions." *Id.* at 683 (citation and internal quotation marks

---

[3] Since "the standards under both of the acts are largely the same, cases construing one statute are instructive in construing the other." *Andrews v. Ohio*, 104 F.3d 803, 807 (6th Cir. 1997) (citation omitted). We often analyze ADA and § 504 claims together, *see S.S. v. E. Ky. Univ.*, 532 F.3d 445, 452-53 (6th Cir. 2008), and we do so again today.

omitted). "If the school does so, the burden shifts back to [Mbawe] to establish that the school's proffered reason is merely a pretext for unlawful discrimination." *Id.* (citation omitted).

The parties do not dispute that Mbawe's mental illness renders him disabled under the ADA and § 504. On the second element, FSU argues, and the district court concluded, that Mbawe was not "otherwise qualified" to continue his studies because he no longer satisfied the pharmacy program's Technical Standards and because he failed to participate in the HPRP monitoring agreement that would have allowed him to maintain his pharmacy intern license. We agree.

"A handicapped or disabled person is 'otherwise qualified' to participate in a program if she can meet its necessary requirements with reasonable accommodation." *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 435 (6th Cir. 1998) (citation omitted). The plaintiff bears the burden of demonstrating that he is qualified by "proposing an accommodation and proving that it is reasonable, including establishing that he can meet a program's necessary requirements with that accommodation." *Shaikh v. Lincoln Mem'l Univ.*, 608 F. App'x 349, 353 (6th Cir. 2015) (quoting *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010); *Kaltenberger*, 162 F.3d at 435) (internal quotation marks omitted).

Without a reasonable accommodation, Mbawe was not qualified to continue in the pharmacy program. As noted above, the program's Technical Standards require that a student "obtain and maintain a valid Pharmacist Intern license in the State of Michigan." When FSU officials medically withdrew Mbawe from the university, the state probate court had already determined—after a full adversarial hearing—that he was suffering from a "substantial disorder of thought or mood that significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life." Mich. Comp. Laws §§ 330.1400(g), 1401. Michigan law required FSU to report Mbawe's condition to LARA, *id.* § 333.16222(a), and LARA

was obligated to initiate administrative proceedings once it learned that Mbawe was suffering from a condition that adversely affected his "ability to practice in a safe and competent manner," *id.* § 333.16221(b)(iii). Once the state court found that Mbawe suffered from a mental illness, he was no longer eligible to hold a pharmacy intern license, and he therefore no longer satisfied the Technical Standards.

Further, the Technical Standards required that Mbawe "possess the emotional and mental health required for full utilization of [his] abilities." [*Id.*] Even prior to his hospitalization, FSU officials were aware that Mbawe's mental illness was adversely affecting his ability to function in the program. He was absent from class and seemed confused regarding his schedule. Mbawe's involuntary commitment only served to heighten these concerns. Here too, Mbawe's illness rendered him unable to meet the Technical Standards.

The question, then, is whether Mbawe could have continued in the pharmacy program *with* a reasonable accommodation. The district court correctly determined that Mbawe failed to "propose[] a reasonable accommodation to account for his disability," as was his duty. *Shaikh*, 608 F. App'x at 354 (quoting *Jakubowski*, 627 F.3d at 202). Mbawe never proposed any accommodation that would have allowed him to continue his studies and remain in compliance with the pharmacy program's Technical Standards. Indeed, in light of the state court's finding that he suffered from a mental illness, it is doubtful that such an accommodation existed, outside of participation in HPRP. This alone proves fatal to Mbawe's statutory claims.

Moreover, Mbawe rejected the accommodation FSU actually proposed—compliance with HPRP's monitoring agreement. In denying Mbawe's appeal, Dr. Blake explained that Mbawe could reapply to the pharmacy program if he was cleared by HPRP. This promise was reaffirmed

by Dean Durst, Dr. Blake, and Dr. Bates in March. Nevertheless, Mbawe refused to sign the agreement before the deadline imposed by HPRP.

Mbawe does not contend that HPRP's proposed monitoring agreement or FSU's request that he comply with it were unreasonable. Rather, his only argument is that he rightly refused to sign the agreement because it contained an inconsequential error stating he was a pharmacist, not a pharmacy student. But this error was attributable to HPRP, not the university; and in any event, Mbawe had a month to seek a correction. He did not. Mbawe cannot now claim that FSU should have provided him another specific accommodation—one that he did not propose—when he refused the reasonable accommodation actually offered to him by the university. *See Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 307 (6th Cir. 2016).

Mbawe's other arguments are similarly unavailing. He claims that FSU officials failed to engage in an "interactive process" to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations," as required by the ADA. *Keith v. Cty. of Oakland*, 703 F.3d 918, 929 (6th Cir. 2013) (citation omitted). This argument fails for two reasons.

First, we have held in the employment context that, to trigger the duty to participate in the interactive process, "[a]n employee has the burden of proposing an initial accommodation." *Jakubowski*, 627 F.3d at 202. Mbawe fails to explain why this rule should be any different in the educational context. As noted above, Mbawe failed to propose any accommodation that would have allowed him to remain qualified to be a pharmacy student, so FSU's duty to engage in the interactive process was never triggered.

Second, we have also held in the employment context that failure to participate in the interactive process "is actionable only if it prevents identification of an appropriate

accommodation for a qualified individual." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 766 (6th Cir. 2015) (citation and emphasis omitted). Here, the only accommodation that would have allowed Mbawe to remain in compliance with the pharmacy program's Technical Standards—participation in HPRP—was identified by FSU and rejected by Mbawe. Because Mbawe failed to make a prima facie showing that he was qualified to continue his studies with or without accommodations, "we need not consider whether [FSU] failed to engage in the interactive process." *Williams v. AT&T Mobility Servs. LLC*, 847 F.3d 384, 395 (6th Cir. 2017).

Mbawe also argues that FSU failed to follow its own policies for dealing with students suffering from a mental illness. True enough. FSU does not deny that the means by which it removed Mbawe from the pharmacy program—an "involuntary medical withdrawal"—was not an authorized university policy. But "the relevant inquiry is whether [FSU] violated the ADA or Section 504 of the Rehabilitation Act, not whether [FSU] followed its internal policies." *Shaikh*, 608 F. App'x at 355. As explained above, FSU violated neither statute. Moreover, Mbawe fails to appreciate that FSU's departure from its own policies worked in his own favor. He does not dispute that, had he failed one or more of his classes, he would have been academically dismissed from the program and that it would have been difficult, if not impossible, for him to ever return. The route chosen by FSU officials, though not authorized under university policy, left open that possibility.

Because Mbawe failed to demonstrate that he was "otherwise qualified" to continue as a student in the pharmacy program, *Gohl*, 836 F.3d at 682, the district court did not err by granting summary judgment in FSU's favor on Mbawe's ADA and Rehabilitation Act claims.

B.

Mbawe also claims FSU deprived him of his Fourteenth Amendment right to procedural due process, in violation of 42 U.S.C. § 1983, by failing to provide him adequate notice and a hearing before withdrawing him from the pharmacy program. To prevail on his procedural due process claim, Mbawe "must show that (1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest." *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006).

The district court assumed, and FSU does not dispute, that Mbawe had "a property and liberty interest in continued enrollment in the pharmacy program." It is undisputed that Mbawe was removed from the program. His § 1983 claim therefore turns on the last element, whether he was afforded adequate process.

The amount of process Mbawe was due depends on whether Mbawe's dismissal was academic or disciplinary in nature. There is a "significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct." *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 86 (1978). When a student is dismissed for academic reasons, the procedural requirements are "far less stringent," *id.*, and "a student is entitled only to notice that his or her academic performance was not satisfactory and a 'careful and deliberate' decision regarding [the school's] punishment," *Yoder v. Univ. of Louisville*, 526 F. App'x 537, 549 (6th Cir. 2013) (citing *Horowitz*, 435 U.S. at 85; *Ku v. Tennessee*, 322 F.3d 431, 436 (6th Cir. 2003)). "In contrast, courts reviewing a disciplinary action must conduct a 'more searching inquiry.'" *Id.* (quoting *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 634 (6th Cir. 2005)).

The term "academic" is something of a misnomer. Especially "in the context of medical school, academic evaluations are not limited to consideration of raw grades or other objective criteria." *Ku*, 322 F.3d at 436. For instance, in *Horowitz*, a medical student's dismissal was deemed academic after "the school warned her that significant improvement was needed not only in the area of clinical performance but also in her personal hygiene and in keeping to her clinical schedules," because "[p]ersonal hygiene and timeliness may be [] important factors in a school's determination of whether a student will make a good medical doctor." 435 U.S. at 91 n.6. Similarly, we held in *Ku* that a medical school did not deprive a student of adequate procedural due process by suspending his studies without first holding a hearing, when the student not only failed an important exam, but also had "continued difficulty interacting with faculty and peers." 322 F.3d at 436; *see also Yoder*, 526 F. App'x at 539-42, 550-51 (university dismissed nursing student for academic reasons when she violated school's Honor Code by revealing confidential patient information on social media).

Here, Mbawe was subjected to an academic dismissal. FSU offered three justifications for withdrawing Mbawe from the pharmacy program: he had missed a significant number of classes, he was in jeopardy of failing his classes, and he was unlikely to maintain his pharmacy-intern license in light of his hospitalization. The district court correctly observed that these justifications plainly related to Mbawe's "ability to succeed in the pharmacy program and [his] fitness to perform as a pharmacist." Mbawe was not, as he claims, removed from school based upon a "violation . . . of valid rules of conduct" or "disruptive or insubordinate behavior." *Horowitz*, 435 U.S. at 86, 90.

Because Mbawe was subjected to an academic dismissal, FSU was not obligated to afford him a formal hearing. *Ku*, 322 F.3d at 436. "[W]hen the student has been fully informed of the

faculty's dissatisfaction with the student's academic progress and when the decision to dismiss was careful and deliberate, the Fourteenth Amendment's procedural due process requirement has been met." *Id.* (citing *Horowitz*, 435 U.S. at 85-86). Here, Dr. Bates discussed with Mbawe the possibility that he might medically withdraw from the pharmacy program before he was hospitalized. [R. 59-15, PageID 1713.] And after Mbawe was released from the hospital, Dean Durst and Dr. Bates met with him and discussed his academic situation. Mbawe was able to use the information he learned during that meeting in his subsequent appeal, the denial of which resulted in his removal from the pharmacy program. Prior to FSU's final decision, then, Mbawe was "fully informed of the faculty's dissatisfaction with [his] academic progress" and the school's concern regarding his fitness to continue as a pharmacy student. *Id.*

As noted above, the record also reflects that the FSU officials responsible for Mbawe's medical withdrawal were "careful and deliberate" in their decision-making. *Id.* They interacted with Mbawe on several occasions, attended the state court hearing that upheld his hospitalization, and extensively discussed the pharmacy program's Technical Standards and licensure requirement. Mbawe was allowed an appeal, the denial of which was explained to him both in person and in writing. Put differently, Mbawe "was given particularized professional attention by faculty members at all levels in an effort to protect patients while helping [Mbawe] improve his chances of success." *Ku*, 322 F.3d at 437; *see also Shaboon v. Duncan*, 252 F.3d 722, 726-28, 731 (5th Cir. 2001) (upholding academic dismissal of a medical student without a hearing after student refused to seek mental health treatment). Mbawe received the process to which he was entitled,

and the district court rightly granted summary judgment in FSU's favor on his procedural due process claim.

IV.

Through no fault of his own, John Mbawe fell victim to a mental illness that eventually cost him a place in his chosen profession. Once the state court determined that Mbawe met the statutory criteria for involuntary commitment, his pharmacy intern license and, by extension, his ability to satisfy the Technical Standards of the FSU pharmacy program were undeniably compromised. Then, perhaps afflicted by his condition, Mbawe refused to pursue the only course of action that afforded him an opportunity to resume his studies and eventually become a pharmacist. This is not to say that FSU could not do better the next time it is confronted with a student facing a mental health crisis. But, affording FSU the deference it is due in this particularly sensitive setting, the district court correctly concluded that Mbawe could not prevail on his statutory and constitutional claims.

AFFIRMED.